# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 14-10949

STATE OF TEXAS,

> Plaintiff - Appellant

v.

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION; JENNY R. YANG, in her official capacity as Chair of the Equal Employment Opportunity Commission; LORETTA LYNCH, U. S. ATTORNEY GENERAL,

> Defendants - Appellees

United States Court of Appeals
Fifth Circuit

**FILED**

June 27, 2016

Lyle W. Cayce
Clerk

Appeal from the United States District Court
for the Northern District of Texas

Before JOLLY, HIGGINBOTHAM, and DAVIS, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

In this declaratory judgment action, the State of Texas appeals the district court's order dismissing this action under Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction. Texas's complaint seeks a declaration that an Enforcement Guidance document from the Equal Employment Opportunity Commission ("EEOC") regarding the hiring of persons with criminal backgrounds violates the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–06. The EEOC has instigated no legal proceedings against the State of Texas regarding the subject of felony hiring bans and Title VII.

No. 14-10949

This appeal requires the court to address only the threshold issues of justiciability and subject matter jurisdiction under both Article III and the APA. In dismissing Texas's complaint, the district court held that Texas lacked Article III standing to bring this action because Texas could not show a substantial likelihood of harm, noting that although the EEOC had the statutory authority to investigate Title VII charges against Texas, it had no authority to bring an enforcement action against the State, that authority belonging only to the Attorney General of the United States. The district court further asserted that Texas's challenge to the EEOC's Enforcement Guidance was unripe, and that, in any event, the court lacked subject matter jurisdiction over the APA claim because the EEOC's Guidance did not constitute "final agency action" under 5 U.S.C. § 704.

Although the parties conflate the issues of standing, ripeness, and "final agency action" under the APA, Texas essentially argues that it has standing because it is an object of the challenged EEOC Guidance, and that the Guidance is a "final agency action" because it creates legal consequences for Texas and all other employers. Texas asserts that the Guidance implements a mandatory regulatory framework for employers *and* EEOC staff to follow, and that the Guidance purports to preempt Texas state law. In response, the EEOC argues that the Guidance is purely advisory, and thus does not create an actual injury sufficient to confer standing. The EEOC further contends that, because it cannot bring an enforcement action against Texas directly, the Guidance is not a "final agency action" under the APA. In making this argument regarding "final agency action," the EEOC relies heavily on several recent decisions from this circuit. The EEOC's arguments regarding ripeness overlap with its arguments regarding a lack of finality, as the EEOC essentially contends that Texas's challenge to the Guidance is unripe until Texas faces a more certain threat of enforcement.

2

No. 14-10949

After full briefing and argument, we REVERSE the district court's judgment and REMAND this action for further proceedings not inconsistent with this opinion.

I.

Although this appeal presents only a jurisdictional issue, this action ultimately seeks to question whether a bar on hiring felons constitutes an unlawful employment practice under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* Title VII makes it unlawful for an employer:

> (1) to fail or refuse to hire or discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

> (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

42 U.S.C. § 2000e-2(a).

Texas employs hundreds of thousands of people across various state agencies. Many of these state agencies do not hire convicted felons, felons convicted of particular categories of felonies, or, in some cases, individuals convicted of particular misdemeanors. The sources of these bans stem from both Texas state statutes and longstanding employment policies adopted by the agencies. According to Texas, its agencies apply the hiring bars neutrally "to all job applicants, without regard to their races." Where these exclusions exist, however, Texas applies them categorically and does not undertake an individualized assessment into the nature of the prospective employee's conviction.

No. 14-10949

Although the EEOC enforces Title VII, its enforcement power is limited in a number of respects that are relevant to this appeal.  First, the EEOC has only the limited regulatory authority "to issue, amend, or rescind suitable procedural regulations to carry out the provisions of this subchapter."  42 U.S.C. § 2000e-12(a).  In other words, the EEOC cannot promulgate binding substantive interpretations of Title VII.  Second, the EEOC lacks the authority to file an enforcement action against a state employer directly.  *See* 42 U.S.C. § 2000e-5(f)(1). The EEOC does, however, have the power to investigate state employers for potential Title VII violations. The EEOC refers any case for which it finds reasonable cause to believe a Title VII violation occurred to the Attorney General of the United States, who then decides whether to bring enforcement action against the state.  *Id.*

Notwithstanding its limitation to only formulating procedural rules, the EEOC holds and advances the view, as expressed through its policy statements, that categorical bans on the hiring of felons can constitute a violation of Title VII when they disproportionately affect blacks and Hispanics. In 2012, the EEOC issued the "Enforcement Guidance on the Consideration of Arrest and Conviction Records in Employment Decisions Under Title VII of the Civil Rights Act of 1964" (the "Enforcement Guidance" or the "Guidance"), which is at issue in this suit.  The Enforcement Guidance provides that

> [w]ith respect to criminal records, there is Title VII disparate impact liability where the evidence shows that a covered employer's criminal record screening policy or practice disproportionately screens out a Title VII-protected group and the employer does not demonstrate that the policy or practice is job related for the positions in question and consistent with business necessity.

The Guidance then sets out a framework for addressing both whether a hiring policy screens out a Title VII-protected group and whether a policy is "consistent with business necessity."  On the first prong, the Guidance lays out

4

No. 14-10949

various criteria that the EEOC will use to determine whether a hiring policy has a disparate impact, and asserts that an employer's evidence of a racially balanced workforce "will not be enough to disprove disparate impact." On the second prong, the Guidance addresses the "job-related, business necessity" defense by offering employers the details of a screening policy that creates a disparate impact, but nonetheless complies with Title VII because it is narrowly tailored to serve a legitimate business need.

Texas filed suit on November 4, 2013, and filed its amended complaint on March 14, 2014. The amended complaint seeks declaratory and injunctive relief, alleging that the Enforcement Guidance is, in effect, a binding substantive interpretation of Title VII and thus violates the APA. The EEOC moved to dismiss the amended complaint on three jurisdictional grounds: (1) standing; (2) ripeness; and (3) lack of subject matter jurisdiction under the APA. The district court granted the motion to dismiss. Although the district court's opinion cites all three grounds as independent bases for dismissal, the district court addressed only in passing the issues of ripeness and jurisdiction under the APA, and emphasized the lack of Article III standing. Texas filed a timely appeal.

## II.

First, we consider whether Texas has Article III standing.[1] Texas can satisfy the constitutional elements of standing by "present[ing] (1) an actual or imminent injury that is concrete and particularized, (2) fairly traceable to the defendant's conduct, and (3) redressable by a judgment in [Texas's] favor."

---

[1] The doctrine of standing is derived from Article III's "Case[]" or "Controvers[y]" requirement, and "'the gist of the question of standing' is whether [the party invoking standing has] 'such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depended for illumination.'" *Massachusetts v. U.S. Envtl. Prot. Agency*, 549 U.S. 497, 517 (2007) (*quoting Baker v. Carr*, 369 U.S. 186 (1962)).

*Durante ex rel. Durante v. City of Lewisville, Tex.*, 759 F.3d 514, 517 (5th Cir. 2014).  A plaintiff must support each standing element "with the manner and degree of evidence required at the successive stages of the litigation." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).  Thus, at the motion to dismiss stage, the court accepts as true all well-pleaded allegations concerning standing.  *Ass'n of Am. Physicians & Surgeons, Inc. v. Tex. Med. Bd.*, 627 F.3d 547, 550 (5th Cir. 2010).   The court reviews de novo a district court's determination of standing.  *Contender Farms, L.L.P. v. U.S. Dep't of Agric.*, 779 F.3d 258, 264 (5th Cir. 2015).  Furthermore, because Texas is bringing this action in its capacity as a sovereign state being pressured to reevaluate state law or incur substantial costs, it "is entitled to special solicitude in our standing analysis." *Massachusetts*, 549 U.S. at 520.

Our discussion here begins with "a basic question that underlies all three elements of standing—'whether the plaintiff is [itself] an object'" of the challenged agency "rule." *Contender Farms*, 779 F.3d at 264 (quoting *Lujan*, 504 U.S. at 561).  If a plaintiff can establish that it is an "object" of the agency regulation at issue, "there is ordinarily little question that the action or inaction has caused [the plaintiff] injury, and that a judgment preventing or requiring the action will redress it." *Lujan*, 504 U.S. at 561–62.  "[W]hether someone is in fact an object of a regulation is a flexible inquiry rooted in common sense." *See Contender Farms*, 779 F.3d at 265.

We have no question but that Texas is an "object" of the challenged Enforcement Guidance, which, as we shall later see more fully, has a regulatory effect on employers.  With the narrow exception of some federal agency employers, the Guidance purports to apply to all employers (including state agencies) that conduct criminal background checks as part of their hiring process.  Indeed, the EEOC effectively concedes that Texas—or any other employer subject to Title VII, for that matter—is an object of the Guidance at

issue, but nevertheless argues that Texas lacks standing to mount a legal challenge to the Enforcement Guidance because, being purely advisory, the Guidance does not impose any obligations on Texas or expose it to any legal consequences. In making this argument, the EEOC erroneously conflates the question of standing under Article III with the question of "final agency action" under the APA. Although the two inquiries may engage similar concerns, *constitutional* standing analysis is ultimately separate from the question of whether "final agency action" exists within the meaning of § 704 of the APA. *See, e.g.*, *Holistic Candlers and Consumers Ass'n v. Food & Drug Admin.*, 664 F.3d 940, 943–45 (D.C. Cir. 2012) (concluding that the plaintiffs established constitutional standing, but nonetheless finding that the plaintiffs failed to show "final agency action" under the APA); *see also Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (noting that constitutional standing and "final agency action" are separate inquires).

As Texas is an object of the Guidance at issue, there is no reason to deviate from the presumption that Texas has constitutional standing to challenge it. The district court found that Texas lacked an injury sufficiently concrete and imminent to confer standing because Texas did not allege that any enforcement action had been filed against it by the Department of Justice ("DOJ"). An enforcement action is not, however, the only injury sufficient to confer constitutional standing upon Texas. Texas alleges several injuries that it is *currently* suffering because of the Guidance. First, Texas asserts that the Guidance imposes a mandatory scheme for employers regarding hiring policies. If we take these allegations as true, the Enforcement Guidance amounts to an increased regulatory burden on Texas as an employer, and "[a]n increased regulatory burden typically satisfies the injury in fact requirement."

7

No. 14-10949

*See Contender Farms*, 779 F.3d at 266 (citing *Ass'n of Am. R.R.s v. Dep't of Transp.*, 38 F.3d 582 (D.C. Cir. 1994)).[2]

Texas further asserts that the Enforcement Guidance effectively preempts state laws that bar employee-applicants with certain criminal histories from being considered for specific jobs, such as school teachers or state law enforcement officers.  Regardless of whether the Guidance actually preempts Texas's laws regarding hiring bans, the Guidance does, at the very least, force Texas to undergo an analysis, agency by agency, regarding whether the certainty of EEOC investigations stemming from the Enforcement Guidance's standards overrides the State's interest in not hiring felons for certain jobs.[3]  Putting aside the question of whether these practical injuries transform the Guidance into "final agency action" for the purposes of APA jurisdiction, these injuries are sufficient to confer constitutional standing, especially when considering Texas's unique position as a sovereign state defending its existing practices and threatened authority.  *See Texas v. United States*, 787 F.3d 733, 749 (5th Cir. 2015) (finding, in the context of an appeal of a denial of a stay, that the government failed to make a showing that Texas lacked standing to challenge another federal agency's action when, as a result of that action, Texas faced a "forced choice between incurring costs and changing its laws").[4]  As this court has stated before, "being pressured to

---

[2] The dissent's argument with respect to Article III standing—casting the Guidance as merely an expression of the EEOC's view on Title VII—assumes that the Guidance is not binding on EEOC staff in the performance of their official duties.  As this opinion makes clear, however, the Guidance shows the opposite.  These features of the Guidance are discussed more in depth *infra* Part III, as they are also crucial to the discussion of whether the Guidance is "final agency action" under the APA.

[3] Indeed, the EEOC admitted at oral argument that it intended to investigate disparate impact complaints against Texas for non-compliance with the Guidance's criminal background screening standards.

[4] As stated, the court in *Texas v. United States*, 797 F.3d 733, affirmed the district court's denial of a stay regarding an injunction against the Department of Homeland Security's "DAPA" program, which made certain illegal aliens eligible for select federal

change state law constitutes an injury" for the purpose of state standing analysis. *Id.*; *see also Texas v. United States*, 809 F.3d at 156–57 (concluding that Texas had standing to challenge agency action even when it could avoid financial harm by changing its own laws and practices, and asserting that "[s]tates have a sovereign interest in the power to create and enforce a legal code, and the possibility that a plaintiff could avoid injury by incurring other costs does not negate standing" (internal quotations and citations omitted)).

In sum, the district court erred; Texas has constitutional standing to challenge the Enforcement Guidance under the APA. Texas has standing because it is an object of the Guidance and, taking the complaint's allegations as true, has alleged a sufficient injury in fact, that is that the Guidance forces Texas to alter its hiring policies or incur significant costs. The court now turns to whether the EEOC's Enforcement Guidance is a "final agency action" under the APA.

## III.

The APA provides that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C.

---

benefits. Texas asserted that, by virtue of becoming eligible for these federal benefits, illegal aliens would also be entitled to driver's licenses and state unemployment benefits, which would raise state costs. The government contended that no injury existed, as DAPA did not, on its own, require states to issue driver's licenses or subsidize to account for increased costs. This court, however, found that the government failed to show that Texas lacked standing, asserting that "Texas's forced choice between incurring costs and changing its laws is an injury because those laws exist for the administration of a state program, not to challenge federal law, and Texas did not enact them merely to create standing." *Id*; *see also id.* (citing with approval a Sixth Circuit opinion that held "making the enforcement of an existing state law more difficult qualifies" as an injury for the purposes of Article III standing (citing *State of Ohio ex rel. Celebrezze v. U.S. Dept. of Transp.*, 766 F.2d 228, 232–33 (6th Cir. 1985))). This court has since affirmed the district court's grant of injunctive relief against DAPA, concluding, for many of the same reasons, that Texas had standing. *See Texas v. United States*, 809 F.3d 134 (5th Cir. 2015), *aff'd by an equally divided Court*, 579 U.S. \_\_\_, 2016 WL 3434401 (June 23, 2016).

§ 702. An aggrieved party is entitled to seek this review, however, only if the agency action is "made reviewable by statute" or, relevant to this appeal, whether the action is "final agency action for which there is no other adequate remedy in a court." *Id.* § 704. In this circuit, the "final agency action" requirement is a jurisdictional threshold, not a merits inquiry. *See Peoples Nat'l Bank v. Office of the Comptroller of the Currency of the United States*, 362 F.3d 333, 336 (5th Cir. 2004) ("If there is no 'final agency action,' a federal court lacks subject matter jurisdiction." (citing *Am. Airlines, Inc. v. Herman*, 176 F.3d 283, 287 (5th Cir. 1999))).

An administrative action is "final agency action" under the APA if: (1) the agency's action is the "consummation of the agency's decisionmaking process;" and (2) "the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett*, 520 U.S. at 177–78 (internal quotation marks omitted). "In evaluating whether a challenged agency action meets these two conditions, this court is guided by the Supreme Court's interpretation of the APA's finality requirement as 'flexible' and 'pragmatic.'" *Qureshi v. Holder*, 663 F.3d 778, 781 (5th Cir. 2011) (quoting *Abbott Labs. v. Gardener*, 387 U.S. 136, 149–50 (1967)). The standard of review is de novo. *Id.* at 780. The parties do not appear to contest that the Enforcement Guidance is the "consummation" of the EEOC's decisionmaking process. Thus, this appeal turns on the second prong of the *Bennett* test, and the court must determine whether the EEOC Guidance constitutes an agency action "by which rights or obligations have been determined," or, in the alternative, "from which legal consequences will flow." *Bennett*, 520 U.S. at 178.

### A.

The EEOC contends that the Guidance does not create "legal consequences" because the EEOC lacks the authority to bring an enforcement

No. 14-10949

action against Texas directly; that is, it can only refer a case to the U.S. Attorney General for prosecution following an EEOC investigation. Texas, however, asserts that the Guidance creates legal consequences that go beyond the mere threat of investigation and agency referral. Specifically, Texas argues that the Guidance itself creates legal consequences because it binds EEOC staff to a specific course of action, and asserts that an employer who adheres to one of the Guidance's two "safe harbor" provisions will avoid a finding of liability before the EEOC, and thus will avoid DOJ referral and enforcement. *See Cohen v. United States*, 578 F.3d 1, 9 (D.C. Cir. 2009) ("When 'the language of the [agency] document is such that private parties can rely on it as a norm or safe harbor by which to shape their actions, it can be binding as a practical matter.'" (quoting *Gen. Elec. Co. v. U.S. Envtl. Prot. Agency*, 290 F.3d 377, 383 (D.C. Cir. 2002)), *vacated in part on other grounds*, 599 F.3d 652 (D.C. Cir. 2010)); *see also U.S. Army Corps of Engineers v. Hawkes Co., Inc.*, 136 S. Ct. 1807, 1814 (2016) (stating that an agency action creates "legal consequences" when it "narrows the field of potential plaintiffs and limits the potential liability" that a regulated entity faces).

The alleged safe harbor provisions read as follows:

Two circumstances in which the Commission believes employers will consistently meet the "job related and consistent with business necessity" defense are as follows:

- The employer validates the criminal conduct screen for the position in question per the Uniform Guidelines on Employee Selection Procedures (Uniform Guidelines) standards (if data about criminal conduct as related to subsequent work performance is available and such validation is possible); or

- The employer develops a targeted screen considering at least the nature of the crime, the time elapsed, and the nature of the job (the three *Green* factors), and then provides an opportunity for an individualized assessment for people excluded by the

11

> screen to determine whether the policy as applied is job related
> and consistent with business necessity.

The Enforcement Guidance clarifies what sort of individualized assessment is required by the second provision,[5] providing that such an assessment

> would consist of notice to the individual that he has been screened
> out because of a criminal conviction; an opportunity for the
> individual to demonstrate that the exclusion should not be applied
> due to his particular circumstances; and consideration by the
> employer as to whether the additional information provided by the
> individual warrants an exception to the exclusion . . . .

Reviewing the parties' arguments, we find that the Guidance imposes "legal consequences" in the sense that the EEOC has committed itself to applying the Guidance when conducting enforcement and referral actions; in particular, the Guidance suggests that its provisions are to be taken as conclusive, and offers only two escapes from an adverse EEOC determination. Moreover, the promulgation of the Guidance is an agency action by which "rights and obligations" have been determined: the agency has committed itself to following the Guidance, and has assured employers that if they conform their conduct to the Guidance's "safe harbor" requirements, they will not be deemed to be in violation of Title VII by EEOC investigators. Such an exoneration by EEOC investigators would, in turn, ensure that Texas is protected from referral of its case to the U.S. Attorney General for prosecution, and, ultimately, from a potential finding of injunctive and/or monetary liability in a DOJ-led prosecution.

In defending the Guidance against the scrutiny of the federal courts, the EEOC comes down hard and often on the mantra that the Guidance is not final

---

[5] The parties do not discuss the first safe harbor—the Uniform Guidelines on Employee Selection Procedures—in any detail. Accordingly, the court also focuses on only the second purported "safe harbor," which flows in part from the Eighth Circuit's analysis in *Green v. Missouri Pacific Railroad Co.*, 523 F.2d 1290 (8th Cir. 1975).

No. 14-10949

agency action because the EEOC cannot directly bring an enforcement action against Texas, since only the U.S. Attorney General can enforce Title VII against a sovereign state.  But the Guidance is not simply limited to one or only a few investigations conducted by the EEOC against Texas or some other state.  Instead, it is a blanket policy that the EEOC has committed itself to applying with respect to virtually all public and private employers.[6]  The EEOC does not dispute that, as a general matter, agency "guidance" that cabins an agency's discretion with respect to enforcement actions can be considered "final agency action."  Holding that the Guidance is not "final agency action" simply because the EEOC cannot bring an enforcement action against Texas directly would stand for the proposition that whether a blanket agency rule is "final agency action" turns on the identity of the class of plaintiffs, instead of the nature, character, and effect of the rule in and of itself.  In other words, to hold that the Guidance is not "final agency action" solely because of the EEOC's limited enforcement authority with respect to a state employer is essentially to hold that there is no rule-related EEOC action against a state that is reviewable under the APA, even though the EEOC clearly can subject state employers to harms sufficient to confer Article III standing.  Accordingly, the "flexible" and "pragmatic" approach to assessing the finality of agency action, *see Qureshi*, 663 F.3d at 781, leads to the conclusion that the Guidance is "final agency action" under § 704 of the APA.

---

[6] Specifically, the Enforcement Guidance unambiguously states that "the [EEOC] intends this document for use . . . by EEOC staff who are investigating discrimination charges involving the use of criminal records in employment decisions."  Elsewhere, the Guidance asserts that "[t]he EEOC enforces Title VII, which prohibits employment discrimination based on race, color, religion, sex, or national origin."  Thus, in practical terms, the Enforcement Guidance indicates that the EEOC staff will be bound to follow the Guidance's standards when making enforcement-related decisions.

No. 14-10949

B.

1.

The EEOC does not dispute that its staff would use the Guidance when conducting their official duties under Title VII.  Nor does it dispute that, if employers will conform their conduct to reflect the "safe harbors" set forth by the Guidance, such employers would virtually always escape adverse EEOC determinations on charges of felony hiring discrimination, and thus effectively be immunized from a DOJ-backed enforcement action.  Still, the EEOC points to two cases of this court, *Luminant Generation Co., L.L.C. v. United States Environmental Protection Agency*, 757 F.3d 439, 442 (5th Cir. 2014), and *Belle Co., L.L.C. v. United States Army Corps of Engineers*, 761 F.3d 383 (5th Cir. 2014), *judgment vacated by Kent Recycling Servs., LLC v. U.S. Army Corps of Engineers*, ---S. Ct.---, 2016 WL 3128836 (June 6, 2016), which it argues preclude a holding that the Enforcement Guidance is "final agency action."

We begin our review of this authority by noting that the Supreme Court recently vacated this court's judgment in *Belle Co.*, and remanded the case for this court to reconsider its holding in the light of *U.S. Army Corps of Engineers v. Hawkes Co., Inc.*, 136 S. Ct. 1807 (2016).  In *Belle Co.,* this court had held that the Army Corps of Engineers' "affirmative" jurisdictional determination ("JD"), which asserted that the plaintiff's property development was subject to the Clean Water Act's ("CWA") permitting requirements, did not create legal consequences.  *See Belle Co.,* 761 F.3d at 394.  The court had reasoned that the agency's determination of its own authority did not create legal consequences because the determination merely notified the plaintiff that it was subject to permitting requirements.  As this court then stated, the JD did nothing to alter the plaintiff's legal obligations, because "even if [the plaintiff] had never requested the [determination] and instead had begun to fill [the land], it would not have been immune to enforcement action by the Corps or EPA."  *Id.* at 391.

In everyday language, the plaintiff was no worse off after the JD issued than it was before.

In *Hawkes Co.*, however, the Supreme Court rejected such reasoning and effectively reversed our decision in *Belle Co.* Under nearly identical facts, the Court concluded that the Corps' issuance of an "affirmative" JD, which, as in *Belle Co.*, asserted that a petitioner's property is subject to the CWA's permitting requirements, is a "final agency action" under the APA because it creates legal consequences. *Hawkes Co.*, 136 S. Ct. at 1814. This is so, the Supreme Court observed, because if the Corps had issued a "negative" JD—that is, a JD stating that the plaintiff's property did not contain "waters of the United States"—the plaintiff would have been entitled to a five-year period of protection from any government-brought CWA enforcement action. *Id.* In short, the determination to issue the affirmative JD denied the plaintiffs the benefits that would have flowed from a negative JD, and thus this effect constituted "legal consequences" to the plaintiffs resulting from the affirmative JD. *Id.*

In reaching this holding, the Supreme Court once again emphasized that a "pragmatic" approach must be taken when deciding whether an agency action is "final," and thus subject to court review:

> This conclusion tracks the "pragmatic" approach we have long taken to finality. For example, in *Frozen Food Express v. United States*, 351 U. S. 40 (1956), we considered the finality of an order specifying which commodities the Interstate Commerce Commission believed were exempt by statute from regulation, and which it believed were not. Although the order "had no authority except to give notice of how the Commission interpreted" the relevant statute, and "would have effect only if and when a particular action was brought against a particular carrier," we held that the order was nonetheless immediately reviewable. . . . So too here, while no administrative or criminal proceeding can be brought for failure to conform to the approved JD itself, that final agency determination not only deprives

15

respondents of a five-year safe harbor from liability under the Act, but warns that if they discharge pollutants onto their property without obtaining a permit from the Corps, they do so at the risk of significant criminal and civil penalties.

*Id.* at 1815 (internal citations omitted).

As the above passage applies to this case, an agency action can create legal consequences even when the action, in itself, is disassociated with the filing of an enforcement proceeding, and is not authority for the imposition of civil or criminal penalties. Instead, "legal consequences" are created whenever the challenged agency action has the effect of committing the agency itself to a view of the law that, in turn, forces the plaintiff either to alter its conduct, or expose itself to potential liability. In *Hawkes Co.*, this agency action was the issuance of a JD asserting that the plaintiff's land was subject to the CWA's permitting requirements, thus depriving the plaintiff of the agency-created safe harbor and forcing the plaintiff to submit to the agency's view or risk liability. Here, it is the EEOC's promulgation of the Guidance, which offers regulated entities a safe harbor from DOJ referral, and thus ultimately from liability, only if employers alter their hiring policies to comply with the Guidance's directives.[7]

---

[7] In a post-argument letter, submitted after the issuance of *Hawkes Co.* and pursuant to Fed. R. App. P. 28(j), the government argues—for the first time and without citation to authority—that the Guidance does not create a safe harbor because the DOJ could always disagree with a favorable EEOC finding, and thus bring an enforcement action against a public employer even where the EEOC has first conducted an investigation and concluded that no Title VII violation has occurred. We disagree, and note that Title VII's enforcement provision contemplates EEOC referral as a prerequisite for any DOJ-brought enforcement action. *See* 42 U.S.C. 2000e-5(f)(1) ("If the [EEOC] has been unable to secure from the respondent a conciliation agreement acceptable to the [EEOC], the [EEOC] shall take no further action and shall refer the case to the Attorney General who may bring a civil action against such respondent in the appropriate United States district court."); *see also United States v. South Carolina*, 445 F. Supp. 1094, 1110 (D.S.C. 1977) ("It is also clear from the language of Section [2000e-5] that individual complaints against public employers are to be brought to the [EEOC] . . . and that the [EEOC] is to proceed with its 'informal methods of conference, conciliation and persuasion.' Only when such methods fail does authority shift to the Attorney General, who is then empowered to bring a civil action. The Attorney General

No. 14-10949

As we earlier noted, the EEOC also points to a second Fifth Circuit decision as suggesting a finding that the Guidance is not final agency action. *See Luminant*, 757 F.3d 439. In *Luminant*, the plaintiff, an energy company, received two notices of violation ("NOVs") from the EPA, asserting that two of its Texas-based power plants were emitting pollutants in violation of multiple provisions of the Clean Air Act and the state-level implementation plan. This court held that a challenged EPA notice of violation ("NOV") was not "final agency action" because the relevant federal statute, the Clean Air Act, and not the NOV, set out the parties' obligations. *Luminant*, 757 F.3d at 442. Specifically, the court reasoned that "adverse legal consequences will flow only if the district court determines that Luminant violated" the Clean Air Act. *Id.* Phrased differently, the court asserted that, so long as the EPA took no further action, "Luminant would have no new legal obligation imposed on it and would have lost no right it otherwise enjoyed." *Id.*

To the extent that the Supreme Court's decision in *Hawkes Co.* does not also undermine the Fifth Circuit's reasoning in *Luminant* (principally, the Supreme Court's emphasis on a "pragmatic approach" to assessing whether APA review is appropriate, instead of reliance on formalistic criteria, such as whether the agency decision itself imposes penalties or is binding on a court), we find *Luminant* distinguishable from the instant case. The agency document in *Luminant* merely expressed the agency's opinion about the legality of the plaintiff's conduct; it did not, as here, commit the administrative agency to a specific course of action should the plaintiff fail to comply with the agency's view. Furthermore, the agency action in *Luminant* was limited to a fact-

---

has no authority to investigate such charges or to bring such actions on his own initiative, but can only step in to sue public employers with respect to individual complaints when a case is referred to him by the [EEOC] following the procedures prescribed in [42 U.S.C. § 2000e-5]."), *aff'd by* 434 U.S. 1026 (1978).

17

specific situation and a particular violator. In contrast, the Guidance here provides an analytical framework that applies across the board to *all* employers—including the hundreds of state agencies at issue in this suit, which employ hundreds of thousands of employees—and binds EEOC staff in later actions. *See Barrack Goldstrike Mines, Inc. v. Browner*, 215 F.3d 45, 48–49 (D.C. Cir. 2000) (finding that "legal consequences" existed, even when no enforcement action had yet been threatened against the plaintiff, where the agency expressed a definitive agency position that applied to all facilities within its regulatory purview, and had the effect of requiring all regulated facilities to undertake increased reporting and record-retention obligations or risk enforcement actions and fines). Furthermore, as earlier said, the Guidance's safe harbor provisions set out rules that employers are to follow if they wish to avoid legal consequences. Or, stated another way, an employer is assured protection from agency referral and prosecution—effectively immune to a government-backed enforcement action—if it conducts itself in the manner prescribed by the Guidance.

Finally, other factors distinguish the Guidance from the type of agency action that this court previously has indicated does not create legal consequences. For example, the Enforcement Guidance does not simply repeat the relevant provisions of Title VII. Instead, the Guidance purports to interpret authoritatively both the meaning of "disparate impact" in the context of employer hiring policies regarding criminal convictions and the scope of the "job related, business necessity" defense. This court has always considered such a distinction important when deciding whether agency action is "final" under the APA. *See Resident Council of Allen Parkway Vill. v. U.S. Dep't of Hous. & Urban Dev.*, 980 F.2d 1043, 1056 (5th Cir. 1993) (finding that the Department of Housing and Urban Development's "internal and informal" interpretation of the relevant statutory term did not constitute "final agency

No. 14-10949

action" under the APA, but adding that "[w]ere HUD to formally define the phrase [at issue] . . . [the plaintiffs] would undoubtedly have the right to review HUD's final agency action under § 702 [of the APA]").

2.

In addition to relying on this court's precedents, the EEOC also leans heavily on *AT&T Co. v. Equal Employment Opportunity Commission*, 270 F.3d 973 (D.C. Cir. 2001), in asserting that its Enforcement Guidance is not "final agency action." In *AT&T*, the D.C. Circuit considered whether language in the EEOC's compliance manual regarding the calculation of pregnancy leave was "final agency action" under the APA. The litigation ultimately concerned whether the plaintiff employer was required to give former employees credit towards their pensions for time missed due to pregnancy before the passage of the Pregnancy Discrimination Act of 1979 (the "PDA"). The plaintiff employer challenged language in the EEOC's compliance manual that stated that denying full work credit for pre-PDA pregnancy leave was "past discrimination" sufficient to constitute a "present violation of Title VII." *Id.* at 974–75. The plaintiff employer also challenged several letters that the EEOC sent to the plaintiff suggesting that its practices violated Title VII. The plaintiff argued that the EEOC's actions, taken as a whole, made clear that it reached a conclusion concerning the plaintiff employer's policy, and that that conclusion was "final agency action" under the APA. *Id.* at 975.

The D.C. Circuit disagreed, however, and held that the EEOC's conduct, including its statement in the compliance manual, was not "final agency action" under the APA. *Id.* at 976–77. In making this determination, the court noted that the EEOC "has not inflicted any injury upon [the plaintiff employer] merely by expressing its view of the law—a view that has force only to the extent the agency can persuade a court to the same conclusion." *Id.* at 976. The court also noted that legal consequences did not necessarily flow from the

No. 14-10949

EEOC's actions because "the EEOC is not bound to sue [the plaintiff employer]," and because the compliance manual "does not say whether, how, against which companies, or under what circumstances the Commission will act upon [its] view." *Id.*

The EEOC contends that, like the compliance manual in *AT&T*, Enforcement Guidance is not "final agency action" because it has the force of law only to the extent that a court presiding over any enforcement action agrees with it. In dwelling on this point, however, the EEOC evades the obvious differences. Most notably here, the Enforcement Guidance purports to bind the agency itself. Indeed, the D.C. Circuit recognized in *AT&T* that, had the policy guidance at issue in that case intended to bind EEOC staff in their official conduct, instead of merely expressing the agency's views with respect to employers' actions, the Court would likely have reached a different conclusion:

> Although there are . . . particular circumstances in which an agency's taking a legal position itself inflicts injury or forces a party to change its behavior, such that taking that position may be deemed final agency action, . . . this is not such a case. . . . *Unlike the EPA Guidance at issue in* Appalachian Power*, the EEOC Compliance Manual [at issue in* AT&T*] does not affect the regulated community. Whereas "EPA officials in the field [were] bound to apply" the EPA Guidance . . . the EEOC is not bound to sue AT&T.*

*AT&T*, 270 F.3d at 975–76 (emphasis added) (internal citations omitted).

The policy guidance in *AT&T* provided little to no insight concerning what the EEOC *itself* was obligated to do as a result of the agency's expressed viewpoint. In contrast, the Guidance here provides an exhaustive procedural framework for EEOC officials to follow.[8] As explained *supra* Part III.A, by

---

[8] Whereas the policy statement in AT&T consisted of little more than a fleeting sentence and imposed no obligations on EEOC staff, the Enforcement Guidance, which is

20

binding itself to the Guidance's standards and directives, the EEOC has assured employers nation-wide, public and private, that, so long as they conform their conduct to the Guidance's "safe harbor" requirements, they will not be deemed to be in violation of Title VII by EEOC investigators. Thus, they will avoid referral to the U.S. Attorney General for prosecution. This, in turn, guarantees employers that they will not face an ultimate finding of monetary or injunctive liability as a result of a government enforcement action.

For this reason, the EEOC errs in relying on *AT&T* to suggest that agency actions are "final" under the APA only when federal courts are later bound to give deference to the agency's interpretation of the statute at issue. Of course, such a method is one way to show final agency action, but it is only one way. *See, e.g.*, *Hawkes Co.*, 136 S. Ct. at 1815; *Frozen Food*, 351 U.S. at 44–45. It is also sufficient that the Enforcement Guidance has the immediate effect of altering the rights and obligations of the "regulated community" (i.e., virtually all state and private employers) by offering them a detailed and conclusive means to avoid an adverse EEOC finding, and, by extension, agency referral and a government-backed enforcement action.

## C.

Finally, we address the major prop of the EEOC's argument: because the EEOC has only investigatory authority over state employers, no action that the EEOC might take with respect to state employers can be "final" for the purposes of review under the APA. Implicit in this argument is the clear suggestion that, although EEOC investigations undoubtedly subject employers to practical harms, no "legal consequences" sufficient to invoke APA

---

over fifty pages in length, routinely uses mandatory language to convey the conduct expected of both EEOC staff and employers.

jurisdiction flow from the mere initiation of an investigation into an employer's hiring practices.

We can certainly agree that an agency's decision to investigate a specific regulated entity, including the issuance of subpoenas related to that investigation, normally does not constitute "final agency action." *See Jobs, Training, and Servs., Inc. v. E. Tex. Council of Gov'ts*, 50 F.3d 1318, 1324 (5th Cir. 1995) (citing *Veldhoen v. U.S. Coast Guard*, 35 F.3d 222, 225 (5th Cir. 1994)).   Texas is not, however, simply challenging the prospect of an investigation by the EEOC.   Instead, it is challenging the Enforcement Guidance itself, which represents the legal standards that the EEOC applies when deciding when and how to conduct such an investigation, and what practices may require charges. The Guidance is an agency determination in its final form and is applicable to all employers nation-wide; it is not an intermediate step in a specific enforcement action that may or may not lead to concrete injury.   Indeed, when previously concluding that the threat of agency investigation is not a "legal consequence," this court has relied heavily on the notion that such an investigation is merely an initial, relatively inconsequential step towards a definitive declaration of the petitioner's legal rights and obligations regarding the dispute that prompted the investigation. *See Stockman v. Fed. Election Comm'n*, 138 F.3d 144, 155 (5th Cir. 1998) (citing *Veldhoen*, 35 F.3d at 226).   When, as here, the agency action being challenged is the promulgation of agency rules that mandate such investigations across the entire regulated community, and provide a specific, detailed "safe harbor" practice by which the regulated community may avoid adverse agency findings and eventual DOJ-led prosecution, the agency has already acted definitively by altering both its own obligations and the rights of the regulated entities it oversees.

No. 14-10949

D.

We repeat ourselves to say that, in publishing the Enforcement Guidance at issue, the EEOC has enacted a policy statement couched in mandatory language that is intended to apply to all employers. At no point in this litigation has the EEOC contended that it does not intend to follow the Guidance to its full extent when carrying out its official duties. By nevertheless arguing that the Guidance cannot be reviewed, the EEOC exploits the limitations of its enforcement authority, while denying that state agencies will face legal consequences should they fail to follow the Enforcement Guidance's directives.

The EEOC's Guidance may well be a valid exercise of its authority. That conclusion has yet to be determined. To wholly deny judicial review, however, would be to ignore the presumption of reviewability, and to disregard the Supreme Court's instruction that courts should adopt a pragmatic approach for the purposes of determining reviewability under the APA. *Abbott Labs.*, 387 U.S. at 140 (stating that there is a presumption that judicial review is available to one wronged by agency action); *see also id.* at 149. Accordingly, we find that the Guidance is "final agency action" for the purposes of the APA.[9]

---

[9] Having determined that the Guidance is "final agency action" under the APA, it follows naturally that Texas's APA claim is ripe for review. *See Jobs, Training & Servs.*, 50 F.3d at 1325 (asserting that the ripeness doctrine overlaps with the finality requirement); *see also John Doe, Inc. v. Drug Enforcement Agency*, 484 F.3d 561, 567 (D.C. Cir. 2007) ("Finality, ripeness, and exhaustion of administrative remedies are related, overlapping doctrines that are analytically but not categorically distinct."). Texas's challenge to the EEOC Guidance is a purely legal one, and as such it is unnecessary to wait for further factual development before rendering a decision. *See Roark & Hardee LP v. City of Austin*, 522 F.3d 533, 545 (5th Cir. 2008). Furthermore, Texas faces significant hardships should the court decline to consider its claims. Taking Texas's allegations as true, it must change its hiring practices to ensure compliance with the Guidance, or face the numerous adverse effects already set forth.

No. 14-10949

IV.

To conclude, the district court erred in dismissing this action on justiciability and subject matter jurisdiction grounds. The district court's judgment is therefore REVERSED, and this action is REMANDED to the district court for further proceedings not inconsistent with this opinion.

REVERSED and REMANDED.

No. 14-10949

PATRICK E. HIGGINBOTHAM, Circuit Judge, dissenting:

I am not persuaded that this controversy meets Article III's demand of ripeness, injury, and adversarial engagement. Nor am I persuaded that we have been called upon to review an action of the EEOC with sufficient finality to support our jurisdiction. Texas seeks to challenge an EEOC "Enforcement Guidance" document that the EEOC cannot enforce against it. This description should be enough to resolve this case. I must dissent.

I.

On April 25, 2012, the EEOC issued the "Enforcement Guidance on the Consideration of Arrest and Conviction Records in Employment Decisions Under Title VII of the Civil Rights Act of 1964." The Guidance sets forth the EEOC's legal position that "[a]n employer's use of an individual's criminal history in making employment decisions may, in some instances, violate the prohibition against employment discrimination under Title VII of the Civil Rights Act of 1964." The Guidance's principal observation is that blanket bans on hiring individuals with criminal records—or "criminal record exclusions"— have a disparate impact on minorities. As the majority recounts, the Guidance thus warns that blanket "criminal record exclusions" may violate Title VII unless they are "job related and consistent with business necessity."

On November 4, 2013, the State of Texas filed a complaint seeking "[a] declaratory judgment holding unlawful and setting aside" the Guidance; and "[a] declaration and injunction that" the Department of Justice—the sole government body that can sue a state employer—"may not issue right-to-sue letters to persons seeking to sue the State of Texas or any of its constituent agencies or state officials based on the interpretation of Title VII that appears in" the Guidance. The EEOC moved to dismiss for lack of jurisdiction. The district court granted this motion, concluding that (1) Texas lacks standing to

25

No. 14-10949

challenge the Guidance; (2) the Guidance is not a "final agency action"; and (3) Texas's challenge to the Guidance is not ripe.  Texas appealed to this Court.

II.

This Court lacks subject-matter jurisdiction if Texas does not have standing to challenge the Guidance or if its challenge is not ripe.  So, too, if the Guidance is not a "final agency action."[1]  Texas has the burden to establish that all three of these distinct but complementary requirements have been satisfied.[2]

A.

The history of Title VII and the creation of the EEOC provides critical context for this case.  Congress enacted Title VII of the Civil Rights Act of 1964 to prohibit employers from "fail[ing] or refus[ing] to hire . . . any individual . . . because of . . . race, color, religion, sex, or national origin."[3]  The Act "created . . . the Equal Employment Opportunity Commission," headed by five commissioners, who are "appointed by the President by and with the advice and consent of the Senate" and "not more than three of whom shall be members of the same political party."[4]  The EEOC's original powers of enforcement did not include the power to sue.  On the contrary, the Commission was allowed only to "make an investigation of" charges of discrimination and use informal methods of "conference, conciliation, and persuasion" to bring employers into compliance.[5]  If these efforts failed, the Act authorized private suits "by the person claiming to be aggrieved,"[6] but not by the EEOC.

---

[1] *See Qureshi v. Holder*, 663 F.3d 778, 781 (5th Cir. 2011).

[2] *See, e.g., Choice Inc. of Tex. v. Greenstein*, 691 F.3d 710, 714 (5th Cir. 2012).

[3] Civil Rights Act of 1964, Pub. L. No. 88-352, tit. VII, 78 Stat. 253, 255 (codified as amended at 42 U.S.C. § 2000e-2(a)(1)).

[4] *Id.*, 78 Stat. 258 (codified as amended at 42 U.S.C. § 2000e-4(a)).

[5] *Id.*, 78 Stat. 258-59 (codified as amended at 42 U.S.C. § 2000e-5(b)).

[6] *Id.*, 78 Stat. 260 (codified as amended at 42 U.S.C. § 2000e-5(f)(1)).

No. 14-10949

Congress, however, did authorize the Attorney General to file suit upon "reasonable cause to believe that any person or group of persons is engaged in a pattern or practice of resistance to the full enjoyment of any of the rights secured by [Title VII]."[7]   In enacting this provision, Congress intended to "provide the government with a swift and effective weapon to vindicate the broad public interest in eliminating unlawful practices, at a level which may or may not address the grievances of particular individuals."[8]   Between 1964 and 1972, the Attorney General filed numerous pattern or practice suits pursuant to this authority.[9]   Yet over those eight years, "Congress became convinced . . . that the 'failure to grant the EEOC meaningful enforcement powers [had proved] to be a major flaw in the operation of Title VII.'"[10]   In 1972, Congress gave the EEOC the power to bring two types of suits against private employers alleged to have violated Title VII.[11]   First, "[i]f . . . the Commission [is] unable to secure from the respondent a conciliation agreement acceptable to the Commission, the Commission may bring a civil action against [the] respondent."[12]   And second, "[e]ffective two years after the date of enactment," Congress transferred the Attorney General's power to bring pattern or practice suits to the EEOC.[13]

Notably, Congress *did not* give the EEOC the power to sue state agencies or employers.  Rather, "[i]n the case of a respondent which is a government,

---

[7] *Id.*, 78 Stat. 261 (codified as amended at 42 U.S.C. § 2000e-6(a)).

[8] *United States v. Allegheny-Ludlum Indus., Inc.*, 517 F.2d 826, 843 (5th Cir. 1975).

[9] 118 Cong. Rec. 4080 (1972) (remarks of Sen. Williams); *cf., e.g., United States v. Jacksonville Terminal Co.*, 451 F.2d 418 (5th Cir. 1971); *United States ex rel. Clark v. Dillon Supply Co.*, 429 F.2d 800 (4th Cir. 1970).

[10] *Gen. Tel. Co. of the Nw. v. EEOC*, 446 U.S. 318, 325 (1980) (quoting S. Rep. No. 92-415, at 4 (1971)).

[11] *Id.* at 325-26.

[12] Equal Employment Opportunity Act of 1972, Pub. L. No. 92-261, 86 Stat. 103, 105 (codified as amended at 42 U.S.C. § 2000e-5(f)(1)).

[13] *Id.*, 86 Stat. 107 (codified as amended at 42 U.S.C. § 2000e-6(c)).

governmental agency, or political subdivision, if the Commission has been unable to secure from the respondent a conciliation agreement acceptable to the Commission, the Commission shall take no further action and shall refer the case to the Attorney General who may bring a civil action against such respondent in the appropriate United States district court."[14]   Although this considered judgment by Congress does not resolve all of the issues presented here, the allocution of authority between the Attorney General and the EEOC speaks directly to the Article III questions of standing and ripeness, as well as the finality of the Guidance.  Any challenge to the employment practices of a state employer can proceed only upon decision of the Attorney General, not the EEOC.  This not only underscores the lack of a concrete controversy between the State of Texas and the EEOC, but also accents the reality that this case touches on sensitive political decisions bearing on the essence of dual sovereignty.   In service of this fault line of shared sovereignty, Congress confined the power to sue states for violations of Title VII to a Cabinet-level member of the incumbent administration, a delicate call upon its powers under the Commerce Clause and Section 5 of the Fourteenth Amendment.[15]   This structure must signify in our analysis.

## B.

Turning first to Article III, the want of an adversarial engagement here is palpable.  "Under Article III, § 2, of the Constitution, the federal courts have jurisdiction over this dispute between appellant[] and appellee[] only if it is a 'case' or 'controversy.'   This is a 'bedrock requirement.'"[16]   Indeed, "[n]o

---

[14] *Id.*, 86 Stat. 105 (codified as amended at 42 U.S.C. § 2000e-5(f)(1)).

[15] *See* S. Rep. No. 92-415, at 25 ("This enforcement scheme provides the necessary power to achieve results without the needless friction that might be created by a Federal executive agency issuing orders to sovereign States and their localities.").

[16] *Raines v. Byrd*, 521 U.S. 811, 818 (1997) (quoting *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 471 (1982)).

principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies."[17]    This principle finds expression in the intertwined doctrines of standing and ripeness.  Both require dismissal in this case.

"[T]he 'irreducible constitutional minimum' of standing consists of three elements.  The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision."[18]  While the Guidance is a cloud on the political horizon, it inflicts no injury upon Texas.  The majority concludes otherwise because Texas is the "object" of the EEOC's action.[19]  But that assertion cannot be sustained.  There is no doubt that the EEOC would prefer that Texas follow the Guidance, but it lacks the authority to bring a suit enforcing that preference.[20]  The EEOC may refer a case against Texas to the Attorney General, but the Attorney General has no obligation to adhere to the Guidance.[21]  And if the Attorney General or a private citizen sues Texas, the Guidance is entitled to *Skidmore* deference,[22] at best.[23]  Indeed, as Texas fully concedes, the EEOC does not have the authority to issue a binding

---

[17] *Id.* (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 37 (1976)).

[18] *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (citation omitted) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)).

[19] *See Lujan*, 504 U.S. at 561-62.

[20] *See* 42 U.S.C. § 2000e-5(f)(1).

[21] *See id.* ("In the case of a respondent which is a government, governmental agency, or political subdivision, if the Commission has been unable to secure from the respondent a conciliation agreement acceptable to the Commission, the Commission shall take no further action and shall refer the case to the Attorney General who *may* bring a civil action against such respondent in the appropriate United States district court." (emphasis added)).

[22] *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 110 n.6 (2002).

[23] *Cf. Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2533-34 (2013) (concluding that the EEOC's view was not entitled to any deference).

interpretation of Title VII.[24]  As a result, Texas's reliance on cases involving preemption is misplaced.  The Guidance is not a substantive regulation—it can neither dictate the outcome of a Title VII action nor preempt state law.

The facts here are also distinguishable from this Court's recent decision in *Texas v. United States*.[25]  In *Texas v. United States*, a divided panel of this Court concluded that Texas had standing because it faced a "forced choice between incurring costs and changing its laws."[26]  Texas faces here no such choice—there is no financial penalty if it declines to change its hiring policies beyond the expense of a court proceeding, an expense it has elected to incur. In sum, Texas is left with the argument that the EEOC has injured it by expressing its view of the law.  As the D.C. Circuit has observed, "an injury typically is not caused when an agency merely expresses its view of what the law requires of a party, even if that view is adverse to the party."[27]  This is the "typical[]" case.

## C.

Texas's challenge is also not ripe.  At least since *Abbott Laboratories v. Gardner*, the Supreme Court has recognized that a party may raise a pre-enforcement challenge to an agency action.[28]  "That being said, pre-enforcement review is still subject to the constraints of the ripeness test."[29]  "In deciding whether an agency's decision is, or is not, ripe for judicial review, the Court has examined both the 'fitness of the issues for judicial decision' and the

---

[24] See Texas's First Amended Complaint at 3 (citing 42 U.S.C. § 2000e-12(a)).

[25] 787 F.3d 733 (5th Cir. 2015), *aff'd by an equally divided court*, --- S. Ct. ----, 2016 WL 3434401 (U.S. June 23, 2016).

[26] *Id.* at 749.

[27] *See AT&T Co. v. EEOC*, 270 F.3d 973, 975 (D.C. Cir. 2001).

[28] 387 U.S. 136 (1967).

[29] *Tex. Indep. Producers & Royalty Owners Ass'n v. EPA*, 413 F.3d 479, 482 (5th Cir. 2005).

No. 14-10949

'hardship to the parties of withholding court consideration.'"[30]  Generally, a challenge is fit for judicial decision if it "presents an issue that is 'purely legal, and will not be clarified by further factual development.'"[31]  That the issues here would be significantly aided "by further factual development" is an understatement.  Texas has raised an abstract challenge that is unmoored from a specific "criminal record exclusion," or even a class of "criminal record exclusions."  To be sure, Texas sprinkles some facts into its briefing, but only to illustrate the alleged absurdity of the EEOC's position—not to demonstrate that a particular "criminal conduct exclusion" complies with Title VII.  Such a theoretical challenge is not fit for judicial decision.  Indeed, the Supreme Court has repeatedly warned that "[d]etermination of the scope . . . of legislation in advance of its immediate adverse effect in the context of a concrete case involves too remote and abstract an inquiry for the proper exercise of the judicial function."[32]

Texas responds that the facts are irrelevant because "the whole point of this suit is that the [Guidance] is facially invalid — irrespective of the factual circumstances in which EEOC or DOJ might invoke it."[33]  That is, Texas argues that this Court need not consider a specific "criminal record exclusion" because "the EEOC does not have legal authority to regulate employers' refusals to hire felons."[34]  But the Guidance does not just address the disparate impact of the "blanket no felon-hiring policies" discussed in Texas's briefing—

---

[30] *Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 733 (1998) (quoting *Abbott Labs.*, 387 U.S. at 149).

[31] *Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2347 (2014) (quoting *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 581 (1985)); *see also Roark & Hardee L.P. v. City of Austin*, 522 F.3d 533, 546 (5th Cir. 2008).

[32] *Int'l Longshoremen's & Warehousemen's Union, Local 37 v. Boyd*, 347 U.S. 222, 224 (1954); *accord Texas v. United States*, 523 U.S. 296, 301 (1998); *Renne v. Geary*, 501 U.S. 312, 323 (1991).

[33] Texas's Opening Brief at 43-44.

[34] Texas's Reply Brief at 19.

it also covers a significant amount of less controversial terrain. The Guidance, for instance, contains an entire section about "Disparate Treatment Discrimination and Criminal Records." In this section, the Guidance explains that "there is Title VII disparate treatment liability where the evidence shows that a covered employer rejected an African American applicant based on his criminal record but hired a similarly situated White applicant with a comparable criminal record" and provides several clarifying examples. Unless Texas disagrees with this elementary legal proposition, it cannot seriously contend that the Guidance is invalid "irrespective of the factual circumstances in which EEOC or DOJ might invoke it." The validity of the Guidance must hinge on the specific circumstances in which it is deployed.

Moreover, the Supreme Court rejected an argument almost identical to the one raised here in a previous dispute between the State of Texas and the Federal Government. In *Texas v. United States*, Texas argued that its pre-enforcement challenge to the Voting Rights Act was fit for review because it "asked [the Court] to hold that under no circumstances" was the relevant conduct subject to the Act.[35] The Supreme Court declined to accept this invitation, explaining that it did "not have sufficient confidence in [its] powers of imagination to affirm such a negative." The Court's reasoning is just as applicable here: "The operation of the statute is better grasped when viewed in light of a particular application."[36] Regardless, Texas cannot show that it will suffer any hardship if this Court withholds adjudication.[37] The Guidance does not injure Texas in any way. If Texas is certain that its view of Title VII is

---

[35] 523 U.S. at 301.

[36] *Id.*

[37] *See Lopez v. City of Houston*, 617 F.3d 336, 342 (5th Cir. 2010) ("[E]ven where an issue presents purely legal questions, the plaintiff must show some hardship in order to establish ripeness." (alteration in original) (quoting *Cent. & S.W. Servs., Inc. v. EPA*, 220 F.3d 683, 690 (5th Cir. 2000))).

correct, it faces no hardship in waiting for its day of vindication.

Texas's challenge is also not ripe for the independent reason that it is uncertain whether the Guidance will ever be enforced against it.   Even assuming the EEOC intends to sue every private employer who does not comply with the Guidance, it can only *refer* a case against the State of Texas to the Attorney General.  The possibility that the Attorney General may act on that referral—and because of the non-binding Guidance—is not enough to make Texas's challenge ripe.  As the Supreme Court has oft-repeated, "[a] claim is not ripe for adjudication if it rests upon 'contingent future events that may not occur as anticipated, or indeed may not occur at all.'"[38]  In this respect, the facts of this case are far different from those of *Abbott Laboratories*, where the regulations under review had a "direct and immediate" impact on the plaintiffs and enforcement was a virtual certainty.[39]  Rather, this Court faces facts similar to those presented in one of its companion cases, *Toilet Goods Ass'n v. Gardner*.[40]   In *Toilet Goods*, the Court declined to review the challenged regulation because it "ha[d] no idea whether or when" it would be enforced.[41]  The Court explained that it "believe[d] that judicial appraisal [was] likely to stand on a much surer footing in the context of a specific application of this regulation than could be the case in the framework of the generalized challenge made here."[42]  This Court must abide by this seminal precedent.

---

[38] *Texas*, 523 U.S. at 300 (quoting *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 580-581, (1985)).

[39] 387 U.S. 136, 152-53 (1967); *see also Tex. Indep. Producers & Royalty Owners Ass'n v. EPA*, 413 F.3d 479, 482 (5th Cir. 2005) ("If there is *certainty* that the law will be enforced, then it is irrelevant that the law has yet to be enforced, unless the Government demonstrates that the statute itself specifically demonstrates that Congress has prohibited pre-enforcement review." (emphasis added) (citing *Abbott Labs.*, 387 U.S. at 141)).

[40] 387 U.S. 158 (1967).

[41] *Id.* at 163; *see also Texas*, 523 U.S. at 300.

[42] *Toilet Goods*, 387 U.S. at 164.

No. 14-10949

D.

Apart from these two constitutional hurdles, I am not persuaded that the Guidance is a "final agency action." "As a general matter, two conditions must be satisfied for agency action to be 'final': First, the action must mark the 'consummation' of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature."[43] "And second, the action must be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'"[44] In describing the legal position the EEOC will take in enforcement proceedings, the Guidance delineates "[t]wo circumstances in which the Commission believes employers will consistently meet the 'job related and consistent with business necessity' defense":

> • The employer validates the criminal conduct screen for the position in question per the Uniform Guidelines on Employee Selection Procedures (Uniform Guidelines) standards (if data about criminal conduct as related to subsequent work performance is available and such validation is possible); or

> • The employer develops a targeted screen considering at least the nature of the crime, the time elapsed, and the nature of the job . . . , and then provides an opportunity for an individualized assessment for people excluded by the screen to determine whether the policy as applied is job related and consistent with business necessity.

Texas argues that these "[t]wo circumstances" create legally binding "safe harbors." That is, Texas urges that the EEOC has effectively promised not to bring an enforcement action against any employer with a "criminal record exclusion" that fits within one of the "[t]wo circumstances." The EEOC responds that the Guidance merely expresses its view of the law and carries

---

[43] *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (citation omitted) (quoting *Chi. & S. Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 113 (1948)).

[44] *Id.* at 178 (quoting *Port of Bos. Marine Terminal Ass'n v. Rederiaktiebolaget Transatlantic*, 400 U.S. 62, 71 (1970)).

34

no legal consequences. The majority embraces Texas's position, relying heavily on the Supreme Court's recent decision in *United States Army Corps of Engineers v. Hawkes Co.*[45]

In *Hawkes*, the Court considered whether an "approved jurisdictional determination," or JD, issued by the U.S. Army Corps of Engineers qualifies as a final agency action. The Corps issues JDs in conjunction with the enforcement of the Clean Water Act, which prohibits *inter alia* the discharge of pollutants into "the waters of the United States" without a permit. A JD advises a property owner whether her piece of property contains "waters of the United States." It is "binding for five years on both the Corps and the Environmental Protection Agency, which share authority to enforce the Clean Water Act." As the Court noted, this is significant because "[t]he Clean Water Act imposes substantial criminal and civil penalties for discharging any pollutant into waters covered by the Act without a permit from the Corps."[46] On these facts, the Court readily concluded that a JD is a final agency action. The Court explained that a "negative JD"—that is, "an approved JD stating that a party's property does *not* contain jurisdictional waters"—"creat[es] a five-year safe harbor" from Clean Water Act enforcement. "In other words, a negative JD both narrows the field of potential plaintiffs and limits the potential liability a landowner faces for discharging pollutants without a permit." And from that, "[i]t follows that affirmative JDs have legal consequences as well: They represent the denial of the safe harbor that negative JDs afford."[47]

---

[45] 136 S. Ct. 1807 (2016).

[46] *Id.* at 1811-12.

[47] *Id.* at 1814.

The facts here are far different. A negative JD is a legally binding promise that carries weighty consequences for the affected party.[48] The Guidance does not carry *any* consequences for *any* party. To the contrary, it merely expresses the EEOC's view of the law, or the position that it may take in future enforcement actions. Texas insists that the Guidance goes further and creates two legally binding "safe harbors." But the Guidance contains no definitive or mandatory language. Instead, it sets out "[t]wo circumstances in which the Commission *believes* employers will consistently meet the 'job related and consistent with business necessity' defense." This mushy language cannot fairly be read as a promise to do anything. And even if it creates some level of *practical* pressure, this does not mean that it imposes *legal* consequences.[49]

There is, however, a more fundamental distinction between *Hawkes* and the instant case. When the Corps issues a JD, it informs a *specific* party that it is or is not subject to the Clean Water Act. There is a direct engagement between the two parties concerning a specific tract of land that produces a binding determination with salient and valuable consequences. In this case, the EEOC has not taken any action against Texas—it has issued a general statement of its view of the law. As the D.C. Circuit stated in a similar case:

> In these circumstances, to allow [Texas] to institute litigation with the Commission over the lawfulness of its policy would be to preempt the Commission's discretion to allocate its resources as between this issue and this employer, as opposed to other issues and other employers, as well as its ability to choose the venue for its litigation, as the statute contemplates. *See* 42

---

[48] *See id.* (citing 33 C.F.R. pt. 331, App. C; EPA, Memorandum of Agreement: Exemptions Under Section 404(F) of the Clean Water Act § VI–A (1989)).

[49] *See Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.*, 452 F.3d 798, 811 (D.C. Cir. 2006) ("The flaw in appellants' argument is that the 'consequences' to which they allude are practical, not legal. . . . But *de facto* compliance is not enough to establish that the guidelines have had *legal* consequences.").

No. 14-10949

U.S.C. § 2000e-5(f)(1), (f)(3).  For the court to find here final agency action subject to judicial review, therefore, would disrupt the administrative process in a manner clearly at odds with the contemplation of the Congress.[50]

These concerns are compounded by Congress's decision that the Attorney General—not the EEOC—should determine whether and when to act against a state employer.  Hence, allowing Texas to proceed not only deprives the EEOC of resources that are designated for enforcement actions against private employers—it interferes with the discretion of one of the highest-ranking members of the Executive Branch.  "For the court to find here final agency action subject to judicial review, therefore, would disrupt the administrative process" in more ways than one.

## III.

The majority's opinion is not without purchase, but some basic principles bear repeating:

> The Constitution allots the nation's judicial power to the federal courts.  Unless these courts respect the limits of that unique authority, they intrude upon powers vested in the legislative or executive branches. Judicial adherence to the doctrine of the separation of powers preserves the courts for the decision of issues, between litigants, capable of effective determination.  Judicial exposition upon political proposals is permissible only when necessary to decide definite issues between litigants. When the courts act continually within these constitutionally imposed boundaries of their power, their ability to perform their function as a balance for the people's protection against abuse of power by other branches of government remains unimpaired.  Should the courts seek to expand their power so as to bring under their jurisdiction ill defined controversies over

---

[50] *AT&T Co. v. EEOC*, 270 F.3d 973, 976-77 (D.C. Cir. 2001).

constitutional issues, they would become the organ of political theories.[51]

This case forcefully demonstrates the importance of respecting the limits of Article III. The State of Texas seeks to challenge an "Enforcement Guidance" that the EEOC lacks the ability to enforce against it. This Court should not allow such a nakedly political suit to proceed. That the Attorney General of a State may wish to jumpstart a political fight with the incumbent political party is far from unusual. It is also without surprise that the State's suit here extends an invitation to the judiciary to join the fray. But this is an invitation we must decline. With its "cases" and "controversies" command, Article III walls in and walls out. Chief Justice Marshall taught that we have a duty to decide—but that includes a duty to not do so in the absence of jurisdiction.[52] In dismissing this suit, the district court abided by this duty, a decision which, with due respect to the Texas Attorney General and to our differing roles, if overturned would breach these aged walls. There the matter ought lie until a case or controversy triggers our duty to resolve Texas's not insubstantial challenge to the EEOC's view of the law. Until then, the political arena is the appropriate field of contest. I respectfully dissent.

---

[51] *United Public Workers of America (C.I.O) v. Mitchell*, 330 U.S. 75, 90-91 (1947); *see also Roark & Hardee L.P. v. City of Austin*, 522 F.3d 533, 541-42 (5th Cir. 2008) ("The many doctrines that have fleshed out that 'actual controversy' requirement—standing, mootness, ripeness, political question, and the like—are 'founded in concern about the proper—and properly limited—role of the courts in a democratic society.'" (quoting *Allen v. Wright*, 468 U.S. 737, 750 (1984))).

[52] *See Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264, 404 (1821) ("It is most true that this Court will not take jurisdiction if it should not: but it is equally true, that it must take jurisdiction if it should.").