# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

———————

No. 15-30962

———————

United States Court of Appeals
Fifth Circuit

**FILED**

August 23, 2016

Lyle W. Cayce
Clerk

LOUISIANA STATE, through the Coastal Protection and Restoration Authority Board and the Coastal Protection and Restoration Authority,

Plaintiff - Appellee

v.

UNITED STATES ARMY CORPS OF ENGINEERS; RICHARD L. HANSEN, Colonel, in his official capacity as District Commander for the New Orleans District of the United States Army Corps of Engineers; MICHAEL C. WEHR, Major, in his official capacity as Commander for the Mississippi Valley Division of the United States Army Corps of Engineers; THOMAS P. BOSTICK, Lieutentant General, in his official capacity as Chief of Engineers and Commanding General of the United States Army Corps of Engineers; STEVEN L. STOCKTON, in his official capacity as Director of Civil Works of the United States Army Corps of Engineers; JO-ELLEN DARCY, in her official capacity as Assistant Secretary of the Army (Civil Works),

Defendants - Appellants

———————

Appeal from the United States District Court
for the Eastern District of Louisiana

———————

Before DAVIS, JONES, and GRAVES, Circuit Judges.

EDITH H. JONES, Circuit Judge:

Following Hurricane Katrina, in which the breach of the Mississippi River-Gulf Outlet ("MR-GO") channel caused massive flooding, Congress directed the U.S. Army Corps of Engineers ("Corps") to close the MR-GO as a federal navigation project and restore the surrounding ecosystem. To

implement Congress's 2007 mandate that the deauthorization be "cost effective" and in accordance with a 2006 appropriation bill, the Corps sought a cost-sharing arrangement with the State of Louisiana.  Louisiana objected to any cost-sharing arrangement and sued the Corps under the Administrative Procedure Act ("APA"), contending that the Corps' decision, expressed in two Corps reports to Congress, was arbitrary and capricious and an abuse of discretion because the relevant statutes require the federal government to bear 100 percent of the costs.

The district court agreed with Louisiana.  The court rejected a statute of limitations challenge to the suit and concluded that the relevant statutes unambiguously require the Corps to bear all of the costs of deauthorizing the MR-GO.  We bifurcate the limitations issue and find Louisiana's APA challenge to the closure portion of the deauthorization project timely filed, but we dismiss the challenge to the Corps' decision concerning the ecosystem restoration project because the agency has not taken final action under the APA.  On the merits, we reverse the district court's judgment that overturned the required cost-sharing between Louisiana and the Corps, which constitutes a reasonable interpretation of ambiguous statutes.

## BACKGROUND

The MR-GO is a 76-mile deep-draft navigation channel that was constructed by the Corps at the direction of Congress and opened in 1968.  *See In re Katrina Canal Breaches Litig.*, 696 F.3d 436, 441 (5th Cir. 2012).  The MR-GO cut through virgin Louisiana coastal wetlands to provide a shorter commercial route between the Gulf of Mexico and the Port of New Orleans.  *Id.* at 441–42.  The project designers opted not to armor the banks of the MR-GO with foreshore protection and thus exposed the canal to erosion from the wake of passing ships.  Over the years, the channel expanded to well over three times its original width.  *Id.* at 442, 443 n.1.  Local groups have contended that

No. 15-30962

erosion and the mixing of saltwater and freshwater severely damaged the channel's ecosystem. In the aftermath of Hurricane Katrina, some blamed the Corps' design for exacerbating the Hurricane's devastation.

*Congressional Response Post-Hurricane Katrina:  Deauthorization of MR-GO*

In 2007, Congress passed the Water Resources Development Act ("2007 WRDA"), part of which directed the Corps to close the MR-GO to navigation and restore the ecosystem. This goal was to be accomplished in two steps. First, Congress directed the Assistant Secretary of the Army (Civil Works) to submit a report to Congress detailing how the Corps would, *inter alia*, "physically modify" the MR-GO and restore the "natural features of the ecosystem." Pub. L. No. 110-114, § 7013(a)(3)(B)(i)–(ii), 121 Stat. 1041, 1281 (2007). Upon submission of this report, the MR-GO would be "deauthorized" as a federal project. *Id.* § 7013(a)(1). Second, the 2007 WRDA instructed the Assistant Secretary to "carry out a plan to close the Mississippi River-Gulf Outlet and restore and protect the ecosystem substantially in accordance with [the report submitted to Congress] . . . if the Secretary determines that the project is cost-effective, environmentally acceptable, and technically feasible." *Id.* § 7013(a)(4). Additionally, and as relevant to this case, in order to finance the deauthorization of the MR-GO, Congress instructed the Corps to undertake closure and restoration "in a manner that is consistent with the cost-sharing requirements specified in the Emergency Supplemental Appropriations Act for Defense, the Global War on Terror, and Hurricane Recovery, 2006 (Public Law 109-234)." *Id.* § 7012(b).

The bill referenced by the 2007 WRDA's cost sharing provision is the fourth of four supplemental appropriations bills passed by Congress in the wake of Hurricane Katrina. *See* Emergency Supplemental Appropriations Act for Defense, the Global War on Terror, and Hurricane Recovery, 2006, Pub. L. 109-234, tit. II, ch. 3, 120 Stat. 418, 453–55 (2006) ("Fourth Supplemental").

3

No. 15-30962

The last two of the four bills appropriated funds to the Corps to complete a variety of relief and restoration tasks in New Orleans and throughout the country.

Two provisions in the Fourth Supplemental relate to the MR-GO.[1] First, under the heading "Investigations," the Fourth Supplemental appropriated $3.3 million to the Corps to "develop a comprehensive plan, at full Federal expense, to deauthorize deep draft navigation" on the MR-GO. 120 Stat. at 453. Second, through the Fourth Supplemental, Congress amended a provision in the Third Supplemental that appropriated $75 million of a $327,517,000 appropriation "for authorized operation and maintenance activities along the [MR-GO]." Department of Defense, Emergency Supplemental Appropriations to Address Hurricanes in the Gulf of Mexico, and Pandemic Influenza Act, 2006, div. B, tit. I, ch. 3, 119 Stat. 2690, 2762 (2005) ("Third Supplemental"). With the amendment, Congress added a provision to the Third Supplemental, earmarking "$75,000,000 of the funds provided herein . . . for the repair, construction or provision of measures or structures necessary to protect, restore, or increase wetlands, to prevent saltwater intrusion or storm surge." Fourth Supplemental § 2304, 120 Stat. at 456.

*The Corps' Implementation of the 2007 WRDA*

In January 2008, the Army's Chief of Engineers ("Chief") reported to the Assistant Secretary his recommendations concerning the closure of the MR-GO. The Chief recommended that the channel be closed to navigation by a

---

[1] Other provisions of the Fourth Supplemental appropriated funds to the Corps to undertake various reparation and restoration projects in the New Orleans area, such as raising levee heights, repairing drainage canals throughout the City, and armoring the City's storm damage reduction system. *See* Fourth Supplemental, 120 Stat. at 454–55. The parties substantially agree about the two provisions of the Fourth Supplemental that appropriated funds for the MR-GO.

rock wall spanning its width. The Chief recommended that the rock structure be completed at full federal expense, but also recommended that a non-federal sponsor bear the cost for the lands, easements, rights-of-way, relocations and disposal areas ("LEERDs"), as well as for operation, maintenance, repair, rehabilitation, and replacement ("OMRR&R") of the structure.[2] Louisiana's Coastal Protection and Restoration Authority ("CPRA") was identified as the non-federal sponsor, and the Chief noted that his recommendation was "subject to the non-Federal sponsor executing an agreement with the Department of the Army prior to the Federal Government initiating construction of the closure structure." Importantly, this report only dealt with closing the MR-GO, as the Chief indicated that the Corps' proposal for ecosystem restoration would be addressed in a supplemental report to be submitted at a later date.

On June 5, 2008, the Assistant Secretary transmitted the Chief's report to Congress and signed a record of decision, determining that the Chief's plan was "cost-effective, environmentally acceptable, and technically feasible." On October 31, 2008, the Corps and the State of Louisiana (acting through the CPRA) entered into a Memorandum of Agreement ("MOA") whereby both parties agreed to the cost allocation set out in the Chief's report. Despite the CPRA's explicit agreement to pay for LEERDs and OMRR&R by the terms of the MOA, it insisted on inserting a provision that the CPRA "maintains that the cost sharing and other non-Federal obligations that are required under the

---

[2] This cost sharing allocation was determined by reference to the cost sharing provisions of the 1986 Water Resources Development Act ("1986 WRDA"), which sets forth cost sharing formulas that apply to projects when cost sharing allocations are not established by another statute. *See* 33 U.S.C. § 2218. The Corps relied on 33 U.S.C. § 2213(i), which provides that "non-Federal interests . . . shall provide all lands, easements, rights-of-way, and dredged material disposal areas required for the project and perform all necessary relocations," and 33 U.S.C. § 2213(j)(1), which provides that "[a]ny project to which this section applies . . . shall be initiated only after non-Federal interests have entered into binding agreements with the Secretary to pay 100 percent of the operation, maintenance, and replacement and rehabilitation costs of the project."

No. 15-30962

MOA are inconsistent with the intentions of Congress as it relates to the closure and ecosystem restoration plan."

The Corps addressed the second half of the MR-GO project—restoring the ecosystem—in September 2012 when the Chief submitted a supplemental report to the Assistant Secretary. The Supplemental Report recommended that the federal government would pay for 65 percent of the restoration project and a non-federal sponsor would pay for the other 35 percent.[3] Adhering to its belief that the 2007 WRDA and the Fourth Supplemental required the federal government to bear 100 percent of the far more costly restoration project (in addition to the full cost of the closure project), the CPRA refused to become the non-federal sponsor. Consequently, when the Assistant Secretary transmitted the Supplemental Report to Congress on September 23, 2013, her transmission letter declared only $1.3 billion of the $2.9 billion restoration plan to be "cost-effective, environmentally acceptable and technically feasible." The Assistant Secretary "defer[red] . . . a determination" on the remaining $1.6 billion. Even with respect to the portion of the plan that the Assistant Secretary determined to be cost-effective, however, she acknowledged that a non-federal sponsor had yet to be identified and that the Office of Management & Budget "noted that any construction work would require a cost sharing non-federal sponsor." Consequently, the Assistant Secretary's record of decision approved a "portion" of the plan as cost-effective, environmentally acceptable, and technically feasible, "subject to identification of a cost-sharing" partner.

---

[3] The Corps' cost sharing allocation was based upon the cost sharing formula established by the 1986 WRDA, see *supra* note 2, the relevant portion of which provides that "[t]he non-Federal share of the cost assigned to "environmental protection and restoration" projects "shall be" 35 percent. *See* 33 U.S.C. § 2213(c)(7).

No. 15-30962

The Corps has completed building the rock wall to close the MR-GO to navigation, but the ecosystem restoration portion of the project has not moved forward.

*Procedural History*

On October 28, 2014, Louisiana (acting through the CPRA) sued the Corps under Section 706 of the APA. The district court granted Louisiana's motion for summary judgment. The court first held that Louisiana's lawsuit was not barred by the six-year statute of limitations, 28 U.S.C. § 2401, which applies to civil actions against the United States. The court rejected the Corps' argument that the State's claim accrued when the Corps submitted to Congress its June 5, 2008 Deauthorization Report. Instead, the court held that the MOA entered into by Louisiana and the Corps on October 31, 2008 was the relevant final agency action because the MOA determined Louisiana's "rights and obligations" and was the agency action from which "legal consequences could flow."[4]

The court then held that the Corps' interpretation of the 2007 WRDA and the Fourth Supplemental was not entitled to *Chevron* deference. The court held that the Corps' interpretation of the relevant statutes failed Step 1 of *Chevron* because the "WRDA 2007, read in conjunction with the 4th Supplemental, unambiguously requires the Corps to complete the MRGO closure and ecosystem restoration project at full federal expense." Though the court acknowledged that the Fourth Supplemental is "silent as to how such project [MR-GO deauthorization] would ultimately be funded," the court drew

---

[4] Louisiana filed this lawsuit on October 28, 2014. The lawsuit would be time-barred by 28 U.S.C. § 2401 if the final agency action were determined to be the June 5, 2008 transmission of the Deauthorization Report to Congress, but the lawsuit would be timely if the final agency action resulted from the October 31, 2008 MOA.

7

a parallel between the use of the heading "Construction" in both the 2007 WRDA and the Fourth Supplemental.

Under the "Construction" heading in the Fourth Supplemental, Congress appropriated $20.2 million to reduce the risk of storm damage to the greater New Orleans metropolitan area—at full Federal expense—by restoring surrounding wetlands affected by "navigation, oil and gas, and other channels." Because the restoration of wetlands affected by "navigation . . . and other channels" was to be carried out at full Federal expense, the district court reasoned, Congress's direction to the Corps to close the MR-GO and restore its wetlands in the 2007 WRDA must also be done at full Federal expense because both statutes utilize the "Construction" heading. Given this interpretation that the statutes unambiguously require the Corps to carry out the MR-GO deauthorization at full Federal expense, the district court held that the Corps' contrary interpretation permitting cost sharing was arbitrary and capricious and an abuse of discretion. The Corps has appealed.

## STANDARD OF REVIEW

"We review a grant of summary judgment *de novo*, applying the same standard as the district court." *Buffalo Marine Servs. Inc. v. United States*, 663 F.3d 750, 753 (5th Cir. 2011). As this case arises under the Administrative Procedure Act ("APA"), this court may set aside agency action "only if it is arbitrary, capricious, an abuse of discretion, not in accordance with law, or unsupported by substantial evidence on the record taken as a whole." *Id.* (citation omitted); 5 U.S.C. § 706(2). However, "we owe substantial deference to an agency's construction of a statute that it administers." *Alwan v. Ashcroft*, 388 F.3d 507, 510 (5th Cir. 2004) (citing *Chevron U.S.A, Inc. v. Nat. Res. Def. Council,* 467 U.S. 837, 842, 104 S. Ct. 2778, 2781–82 (1984)). "Under *Chevron* we presume that when an agency-administered statute is ambiguous with respect to what it prescribes, Congress has empowered the agency to resolve

No. 15-30962

the ambiguity. The question for a reviewing court is whether in doing so the agency has acted reasonably and thus has 'stayed within the bounds of the law.'" *Utility Air Regulatory Grp. v. EPA*, 134 S. Ct. 2427, 2439 (2014) (citation omitted).

## DISCUSSION

We consider in turn the Corps' arguments that Louisiana's suit is barred by the six-year statute of limitations and, alternatively, that its cost-sharing decisions are permissible.

## I.    Statute of Limitations & Final Agency Action

28 U.S.C. § 2401(a) states: "every civil action commenced against the United States shall be barred unless the complaint is filed within six years after the right of action first accrues." Because neither the 2007 WRDA nor the Fourth Supplemental provides for judicial review of the Corps' decisions, Louisiana's lawsuit was brought under the APA, which subjects to judicial review "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. Since Louisiana's "right of action first accrues" under the APA when the agency takes "final agency action," the State must have sought review of final agency action that occurred within the six years before it filed suit on October 28, 2014. Resolution of the timeliness issue thus turns on whether the agency action Louisiana is challenging was final.

### A.    Governing Principles

Agency action is "final" if two conditions are satisfied: "First, the action must mark the consummation of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78, 117 S. Ct. 1154, 1168 (1997) (internal quotation marks and citations omitted). "The APA's judicial review provision also requires that the person seeking APA

9

No. 15-30962

review of final agency action have 'no other adequate remedy in a court,' 5 U.S.C. § 704." *Sackett v. EPA*, 132 S. Ct. 1367, 1372 (2012).

Agency action may mark the consummation of the agency's decisionmaking process if the agency action "is not subject to further agency review," *id.* at 1372, which occurs when the agency has "asserted its final position on the factual circumstances underpinning" the agency action, *Alaska Dep't of Envtl. Conservation v. EPA*, 540 U.S. 461, 483, 124 S. Ct. 983, 999 (2004) (internal citation and quotation marks omitted). Additionally, as we recently noted, "legal consequences are created whenever the challenged agency action has the effect of committing the agency itself to a view of the law that, in turn, forces the plaintiff either to alter its conduct, or expose itself to potential liability." *Texas v. EEOC*, 2016 WL 3524242, at \*8 (5th Cir. June 27, 2016); *see also U.S. Army Corps of Eng'rs v. Hawkes Co., Inc.*, 136 S. Ct. 1807, 1814 (2016) (noting that "legal consequences" were created by the Corps' issuance of a "negative jurisdictional determination"—a document indicating that the regulated party's land does not contain "waters of the United States"— because such a determination "narrows the field of potential plaintiffs and limits the potential liability" of the regulated party).

**B.    The Closure Project**

1. The Assistant Secretary's Record of Decision Transmitting the 2008 Deauthorization Report

The Corps argues that the 2008 Deauthorization Report constitutes final agency action for the closure portion[5] of the deauthorization project, and

---

[5] Louisiana contends that the deauthorization of the MR-GO is one indivisible project made up of both closure and ecosystem restoration, both of which had to be addressed by the Corps before there could be final agency action. The Corps, in contrast, conceives of the deauthorization project as proceeding in two discrete steps—first closure, then ecosystem restoration. The Corps argues that it has discretion to choose to tackle a large project such

No. 15-30962

Louisiana's APA challenge to this portion of the project was untimely because the Assistant Secretary transmitted the Report to Congress more than six years before Louisiana sued. The Corps contends that the transmission of the Deauthorization Report by the Assistant Secretary, the highest ranking officer of the Army and the person who oversees the Corps, consummated the agency decisionmaking process. The Corps also argues that transmittal of the Deauthorization Report had legal consequences: deauthorizing the MR-GO, obliging the Corps to begin effectuating the plan outlined in the Report, and requiring the State to agree to share the costs of closure and maintaining the rock wall.

Although this issue is not free from doubt, we disagree with the Corps' position. It is true that the Assistant Secretary's transmission of the 2008 Report to Congress bears some indicia of finality. The Report is titled "Final Deauthorization Report," the Assistant Secretary certified the closure plan as "cost-effective, environmentally acceptable, and technically feasible," and the Corps' statutory duty to carry out the closure in substantial accordance with the Report was triggered by its transmission. Crucially, however, with regard to the key question of cost-sharing, the 2008 Deauthorization Report is decidedly less definite. Indeed, the Report—which the Assistant Secretary's

---

as this one in multiple steps and that its decision to proceed in multiple steps does not mean that earlier steps are *ipso facto* non-final.

We agree with the Corps that it was permissible for the agency to address the deauthorization project in two steps, dealing with the closure first and the ecosystem restoration second. "[O]rdinarily, agencies have wide latitude to attack a regulatory problem in phases and [] a phased attack often has substantial benefits." *Grand Canyon Air Tour Coalition v. Fed. Aviation Admin.*, 154 F.3d 455, 471 (D.C. Cir. 1998); *see also Mass. v. EPA*, 549 U.S. 497, 524, 127 S. Ct. 1438, 1457 (2007) ("Agencies, like legislatures, do not generally resolve massive problems in one fell regulatory swoop . . . . They instead whittle away at them over time, refining their preferred approach as circumstances change and as they develop a more nuanced understanding of how best to proceed."); *Cobell v. Norton*, 240 F.3d 1081, 1095 (D.C. Cir. 2001) (noting that "a single step or measure [of an on-going program] is reviewable" if it is a final agency action).

record of decision incorporated by reference—states that the recommendation as to MR-GO's closure is "made with the provision that, prior to implementation, the non-Federal sponsor [CPRA] agrees with responsibilities and cost sharing requirements."    Further, in his January 2008 letter transmitting the report to the Assistant Secretary, the Chief noted that his recommendation "is subject to the non-Federal sponsor executing an agreement with the Department of the Army prior to the Federal Government initiating construction of the closure structure."

Therefore, the Assistant Secretary's record of decision transmitting the Deauthorization Report appears to be "interlocutory," in that it anticipates the necessity of further agency action before the closure project can be implemented. *Bennett*, 520 U.S. at 178, 117 S. Ct. at 1168–69.  Because only the MOA could bind Louisiana to contribute financially to the deauthorization project, the execution of the MOA was not simply a ministerial act implementing final agency action, as the Corps contends.    Instead, the certification of the Assistant Secretary that the project was cost-effective hinged directly on the federal government's obtaining a non-federal sponsor to share the costs. *Cf.  Texas v. EEOC*, 2016 WL 3524242, at *6 ("the Guidance suggests that its provisions are to be taken as conclusive").

Had the government been unable to obtain Louisiana's assent to cost-sharing, it is likely that the closure project proposed in the 2008 Report could not have gone forward.  That this would have been much more than "a mere possibility that the agency might reconsider in light of 'informal discussion' and invited contentions of inaccuracy," *Sackett,* 132 S. Ct. at 1372, is evidenced by the fact that Louisiana's refusal to enter into an MOA sharing ecosystem restoration costs has stymied that portion of the MR-GO project.  With the key provision of how to finance the closure yet to be finalized, the Assistant Secretary's transmission of the 2008 Deauthorization

No. 15-30962

Report to Congress did not mark the consummation of the agency's decisionmaking process.

The 2008 Deauthorization Report also failed to determine "rights and obligations" of the parties or give rise to "direct and appreciable legal consequences." *Bennett*, 520 U.S. at 178, 117 S. Ct. at 1168–69. Unlike an administrative rulemaking or adjudication that purports to bind parties and alter their conduct, the Secretary's transmission of the Deauthorization Report to Congress could not "force [Louisiana] to alter its conduct, or expose itself to potential liability." *Texas v. EEOC*, 2016 WL 3524242, at *8. Nothing about the Assistant Secretary's transmission of the 2008 Deauthorization Report to Congress regulated Louisiana or could have bound the State to pay for the LEERDs and OMRR&R of the rock structure used to close the MR-GO.

Viewed from the State's perspective, although the Corps' insistence on cost sharing may have put pressure on Louisiana to comply or else risk protracted negotiations with the Corps and a lengthy timetable for completing the closure of the MR-GO, any such consequences are practical, as opposed to legal, ones. *See Reliable Automatic Sprinkler Co., Inc. v. Consumer Prod. Safety Comm'n*, 324 F.3d 726, 732 (D.C. Cir. 2003) (distinguishing between practical harms and legal harms for purposes of the final agency action requirement under the APA); *Flue-Cured Tobacco Cooperative Stabilization Corp. v. EPA*, 313 F.3d 852, 859 (4th Cir. 2002) (noting that an EPA Report submitted to Congress "carrie[d] no legally binding authority" and the "coercive pressures" produced by the Report were not "direct and appreciable legal consequences").

The Assistant Secretary's transmission of the 2008 Deauthorization Report thus failed to create any legal consequences for Louisiana and differs significantly from the legal consequences that typify final agency action reviewable under the APA. Judicially reviewable agency actions normally

13

affect a regulated party's possible legal liability; these consequences tend to expose parties to civil or criminal liability for non-compliance with the agency's view of the law or offer a shelter from liability if the regulated party complies. *Cf. Hawkes Co.*, 136 S. Ct. at 1814 (noting that a negative JD from the Corps "both narrows the field of potential plaintiffs and limits the potential liability" of the regulated party); *Bennett*, 520 U.S. at 170, 178, 117 S. Ct. at 1165, 1168–69 (noting that the Fish and Wildlife Service's "Biological Opinion," which stated that the Bureau of Reclamation's operation of a federal reclamation scheme threatened two endangered species of fish, had "direct and appreciable legal consequences" because disregarding the Biological Opinion's conclusions threatened the future prospect of substantial civil and criminal penalties); *Frozen Food Express v. United States*, 351 U.S. 40, 44, 76 S. Ct. 569, 571 (1956) (order of Interstate Commerce Commission was final agency action because it "warns every carrier, who does not have authority from the Commission to transport [specified] commodities, that it does so at the risk of incurring criminal penalties."); *see also Texas v. EEOC*, 2016 WL 3524242, at *8 (EEOC Guidance document provides regulated entities a "safe harbor from DOJ referral, and thus ultimately liability, only if employers alter their hiring policies to comply with the Guidance's directives").

2. The October 31, 2008 Memorandum of Agreement

The MOA, in contrast, is the relevant final agency action with respect to cost allocation of the closure project. First, the MOA is the consummation of the Corps' decision-making process: it is not tentative or interlocutory, as it is a binding agreement between the Corps and Louisiana that clearly sets out the cost allocation for the closure project. The MOA therefore fulfills the condition that the Assistant Secretary's recommendation of cost-effectiveness contemplated: agreement of the non-federal sponsor to the cost-sharing

allocation set forth in the Deauthorization Report. The agreement marks the consummation of the agency's decision-making process.

Second, the MOA determines the parties' rights and obligations and has legal consequences. Importantly, unlike the Assistant Secretary's record of decision transmitting the Deauthorization Report, legal consequences ensue from the MOA's contractual nature; had Louisiana broken the terms of this agreement, the Corps could have sued the State to enforce its terms.

Because the October 31, 2008 MOA, not the Assistant Secretary's transmission of the 2008 Deauthorization Report, constituted the final agency action, Louisiana's suit filed on October 28, 2014 was within the statute of limitations.[6]

## C.    Ecosystem Restoration

The Corps does not contest the timeliness of Louisiana's challenge to the cost allocation provision of the ecosystem restoration project contained in the 2012 Supplemental Report, and timeliness does not raise a jurisdictional issue in this court.    *Clymore v. United States,* 217 F.3d 370, 374 (5th Cir. 2000). Final agency action, however, is a jurisdictional prerequisite of judicial review. *Am. Airlines, Inc. v. Herman,* 176 F.3d 283, 287 (5th Cir. 1999).  For many of the same reasons that the Assistant Secretary's transmission of the 2008 Deauthorization Report was not final agency action, we conclude that the transmission of the 2012 Supplemental Report likewise fails the test of finality, and judicial review is premature.

First, even more so than the 2008 Report, the transmission of the 2012 Supplemental Report does not mark the consummation of the Corps' decision-making regarding the financing of the ecosystem restoration project. This

---

[6] Louisiana also has "no other adequate remedy in a court," 5 U.S.C. § 704, as neither the 2007 WRDA nor the Fourth Supplemental provides for judicial review of the Corps' implementation of the MR-GO deauthorization. *Sackett*, 132 S. Ct. at 1372.

action is both tentative and interlocutory, *Bennett*, 520 U.S. at 178, 117 S. Ct. at 1168, as it necessarily contemplates future agency action.  The Assistant Secretary approved only part of the ecosystem restoration plan—$1.3 billion of the $2.9 billion projected cost—as cost effective; the Assistant Secretary "defer[red] . . . a determination" on the remaining $1.6 billion. As to the approved portion, the Assistant Secretary cautioned that implementation could not proceed under the plan submitted to Congress until a non-federal sponsor agrees to bear 35 percent of the costs.  Without a non-federal sponsor, to arrive at a cost effective plan the Corps may need to alter the current cost allocation.  That the agency may need to re-work its cost allocation does not appear to be a "mere possibility," *Sackett*, 132 S. Ct. at 1372, because Louisiana has refused to be the non-federal sponsor under the Corps' 65-35 allocation, and the ecosystem restoration plan has yet to be implemented.

Further, the Secretary's transmission of the 2012 Supplemental Report does not "determine rights or obligations" or create "legal consequences."  Like the 2008 Deauthorization Report, the 2012 Report does not regulate Louisiana and cannot bind the State to pay for 35 percent of the ecosystem restoration project.  Nor does this report inflict legal consequences on Louisiana for the State's non-acquiescence, such as exposure to civil or criminal liability for failure to comply.  *Cf. Hawkes Co.*, 136 S. Ct. at 1814; *Bennett*, 520 U.S. at 170, 178, 117 S. Ct. at 1168–69; *Texas v. EEOC*, 2016 WL 3524242, at *8.

Because the Assistant Secretary's transmission of the 2012 Supplemental Report was not a final agency action, we lack jurisdiction to consider Louisiana's APA challenge to the cost-share allocation set out in that Report.  We must vacate the district court's judgment to the extent it opined on the cost-sharing proposal set forth in the 2012 Supplemental Report.

## II.    *Chevron* Deference

The second issue on appeal concerns the district court's application of the *Chevron* doctrine to the Corps' interpretation of two statutes, the 2007 WRDA and the Fourth Supplemental, to support cost-sharing mandated in its 2008 Deauthorization Report.    Under *Chevron*, "we must first decide whether 'Congress has directly spoken to the precise question at issue,' and if it has, we apply Congress's answer to the question."    *Contender Farms LLP v. United States Dep't of Agric.*, 779 F.3d 258, 268 (5th Cir. 2015) (citing *Chevron*, 467 U.S. at 842–43, 104 S. Ct. at 2781–82).    The court evaluates a statute using the "traditional tools of statutory construction:" text, structure, and legislative history.    *Id.*    Second, "if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute."    *Id.*

Louisiana argues that the Corps' interpretation of the 2007 WRDA and Fourth Supplemental fails both steps of *Chevron* analysis.

### A.    *Chevron* Step 1

The 2007 WRDA directs the Corps to carry out deauthorization of the MR-GO in a manner consistent with the cost-sharing requirements in the Fourth Supplemental; consequently we look to that law to determine whether Congress unambiguously spoke to the question who must pay for the closure project.    *See* 2007 WRDA, §7012(b).    Louisiana points to two provisions of the Fourth Supplemental that, the State contends, reflect Congress's unambiguously expressed intention for the Corps to bear 100 percent of the costs to close MR-GO: (1) the Fourth Supplemental's amendment to the Third Supplemental, which provides $75 million for "repair, construction or provision of measures or structures necessary to protect, restore, or increase wetlands, to prevent saltwater intrusion or storm surge"; and (2) the Fourth Supplemental's appropriation of $20.2 million for "reducing the risk of storm

damage to the greater New Orleans metropolitan area, at full federal expense, by restoring the surrounding wetlands."

We disagree with Louisiana's proffered interpretation of these provisions. As previously mentioned, two provisions of the Fourth Supplemental expressly relate to the MR-GO. Under the heading "Investigations," $3.3 million is appropriated to the Corps to "develop a plan, at full Federal expense to deauthorize deep draft navigation" on the MR-GO, 120 Stat. at 453. While this provision states that the plan will be produced at full federal expense, it says nothing about who will pay for the implementation of the plan. The other provision, on which Louisiana focuses, amends the Third Supplemental. Under the "Operations and Maintenance" heading, the Third Supplemental provides that, out of $325,517,000 appropriated to "dredge navigation channels and repair other Corps projects" in the wake of Hurricane Katrina, $75 million of that amount "shall be used for authorized operation and maintenance activities along the [MR-GO]." 119 Stat. at 2762. The Fourth Supplemental's amendment adds to that a provision stating that $75 million "of the funds provided herein shall be used for the repair, construction or provision of measures or structures necessary to protect, restore, or increase wetlands, to prevent saltwater intrusion or storm surge." 120 Stat. at 456.

In addition to the $75 million appropriated for operation and maintenance activities of the MR-GO, then, this amendment earmarks another $75 million for general purposes necessary to protect or restore wetlands. While this allocation might provide a source of federal funds for closing the MR-GO, it does not compel the federal government to bear the entire cost of constructing a structure, let alone the additional cost of LEERDs and OMRR&R. It is arguable, but hardly unambiguous, to infer that the Third Supplemental's provision of $75 million for "authorized operation and maintenance activities along the" MR-GO renders the federal government

responsible for the OMRR&R of the closure structure.  Indeed, once the Deauthorization Report was transmitted to Congress, the MR-GO was no longer an "authorized operation and maintenance activit[y]" and may have become ineligible for those funds.  *See* 2007 WRDA § 7013(a)(1) (noting that, upon submission of the Deauthorization Report, the MR-GO "is not authorized").

We also reject Louisiana's argument that the Fourth Supplemental's appropriation of $20.2 million to the Corps unambiguously establishes that the closure of the MR-GO must be done at full federal expense.  The $20.2 million "may be used to reduce the risk of storm damage to the New Orleans metropolitan area, at full federal expense, by restoring surrounding wetlands through measures to begin to reverse wetland losses in areas affected by navigation, oil and gas, and other channels."  120 Stat. at 454.  This appropriation facilitates the Corps' general handling of ecosystem restoration but it does not address a closure structure for the MR-GO, much less who will bear the cost for the operations and maintenance of the structure.[7]

Even if the statutory text included the construction of a MR-GO closure structure within the ambit of "reduc[ing] the risk of storm damage," the expenditure of the $20.2 million is discretionary, as evidenced by the term "may be used" in the statute, and the Corps did not draw upon this particular appropriation to finance the closure of the MR-GO.  Finally, even if, as the district court concluded, this appropriation could impute some responsibility to the Corps for constructing the closure structure because it appears under

---

[7] Moreover, there is reason to think that these funds are inapplicable to the MR-GO deauthorization, as the Conference Report indicates that the $20.2 million was to be used for projects unrelated to the MR-GO closure.  *See* H.R. Conf. Rep. 109-494, at 114 ("The Corps is further directed to use these funds in the following manner: $10,100,000 to modify the Caernarvon Freshwater Diversion structure or its operations; and $10,100,000 to protect the shoreline along the Barataria Basin Landbridge in Jefferson Parish, Louisiana").

the statutory heading "Construction," it does not follow that the provision could also be construed to require the federal government to bear the entire cost for operation and maintenance of the structure in perpetuity. Such an approach is totally inconsistent with the 2007 WRDA's overarching goal of deauthorizing the MR-GO.

Because no provision in the Fourth Supplemental establishes how the closure of the MR-GO should be financed, this detail was left to be resolved by the Corps. At best, from the State's standpoint, the relevant statutes are ambiguous with respect to who will bear the costs of the MR-GO closure.[8]

## B.   *Chevron* Step 2

Accepting the possibility of statutory ambiguity, Louisiana alternatively argues that the Corps' cost-share allocation is not even a permissible interpretation of the 2007 WRDA and Fourth Supplemental. The State contends that the Corps' decision to derive its cost-sharing allocation from the cost-sharing formulas laid down in the 1986 WRDA was impermissible because the Corps relied on the wrong provision. The Corps should have derived the cost-sharing allocation from 33 U.S.C. § 2212, which sets out cost-sharing formulas for "inland waterway transportation" projects and directs the federal government to bear 100 percent of the cost for LEERDs and OMRR&R of such projects, not 33 U.S.C. § 2213, which sets out cost-sharing formulas for flood control projects and projects with "other purposes," *id.* § 2213(c).

---

[8] Louisiana also contends that the history of the MR-GO project supports the argument that Congress instructed that the MR-GO deauthorization should be completed at full federal expense. Louisiana relies on Congress's instruction in the 1950s that the MR-GO be constructed in accordance with a 1951 Corps Engineers Report, which stated that the construction of the MR-GO would not require local cooperation; and a 2007 floor statement by Louisiana Senator David Vitter. Neither a 1951 Corps Report nor a lone floor statement from the State's own Senator, however, provides insight into the intent of the 2007 Congress or clarifies an otherwise ambiguous text.

"*Chevron* directs courts to accept an agency's reasonable resolution of an ambiguity in a statute that the agency administers." *Michigan v. EPA*, 135 S. Ct. 2699, 2707 (2015). "Even under this deferential standard, however, 'agencies must operate within the bounds of reasonable interpretation.'" *Id.* (citing *Utility Air Regulatory Grp. v. EPA*, 134 S. Ct. 2427, 2442 (2014)). "And reasonable statutory interpretation must account for both the specific context in which language is used and the broader context of the statute as a whole." *Utility Air Regulatory Grp.*, 134 S. Ct. at 2442 (citations, ellipses, and quotation marks omitted). "Thus, an agency interpretation that is inconsistent with the design and structure of the statute as a whole does not merit deference." *Id.* (citation and quotation marks omitted). "If the agency's reasons and policy choices conform to minimal standards of rationality, then its actions are reasonable and must be upheld." *Tex. Oil & Gas Ass'n v. EPA*, 161 F.3d 923, 934 (5th Cir. 1998).

The Corps' interpretation of the 2007 WRDA and the Fourth Supplemental is well within the bounds of permissible interpretation. As we noted, the Fourth Supplemental appropriates funds to the Corps to deal with the fallout from Hurricane Katrina. To achieve its various reparation and restoration goals, Congress employed different methods of instructing the Corps how to finance certain projects. For example, Congress appropriated funds for some purposes to assist in repairing hurricane damage, but it did not specify that the projects be undertaken at full federal expense.[9] In other cases, Congress directed the federal funds to specific projects and instructed

---

[9] *See, e.g.*, 120 Stat. at 454 ("to dredge navigation channels and repair other Corps projects related to the consequences of Hurricane Katrina and other hurricanes of the 2005 season, $3,200,000 to remain available until expended").

that the projects be undertaken at "full federal expense."[10]  Significantly, however, for many of those "full federal expense" projects, Congress expressly directed the Corps to refrain from expending funds until "nonfederal interests have entered into binding agreements with the Secretary requiring the non-Federal interests to pay 100 percent of the operation, maintenance, repair, replacement, and rehabilitation costs of the project."  120 Stat. at 455.

The Corps' cost sharing allocation as regards OMRR&R of the closure structure, then, mirrors one of the funding choices set out in the Fourth Supplemental:  while the Corps would pay to construct the closure structure, Louisiana would be responsible for the OMRR&R.   By employing a cost-sharing method utilized in the Fourth Supplemental itself, the Corps has clearly sought to carry out the closure of the MR-GO "in a manner consistent with the cost-sharing requirements in the [Fourth Supplemental]," 2007 WRDA § 7012(b).  This is unquestionably "within the bounds of reasonable interpretation," *Utility Air Regulatory Grp.*, 134 S. Ct. at 2442.

It was also reasonable for the Corps to rely, in the absence of direction from the Fourth Supplemental, on the cost-sharing provisions set forth in the 1986 WRDA that apply to "all projects in this Act" "unless otherwise specified" when arriving at its cost-sharing allocation for obtaining the LEERDs. 33 U.S.C. § 2218.[11]  Louisiana argues that the Corps should have followed the

---

[10] *See, e.g.*, 120 Stat. at 454–55 (directing the Corps to use funds to "modify, at full federal expense, authorized projects in southeast Louisiana . . . $530,000,000 shall be used to modify the 17th Street, Orleans Avenue, and London Avenue drainage canals and install pumps and closure structures at or near the lakefront; $250,000,000 shall be used for storm-proofing interior pump stations . . . $350,000,000 shall be used to improve protection at the Inner Harbor Navigation Canal").

[11] *See generally* NICOLE T. CARTER & CHARLES V. STERN, CONG. RESEARCH SERV., R41243, ARMY CORPS OF ENGINEERS: WATER RESOURCE AUTHORIZATIONS, APPROPRIATIONS, AND ACTIVITIES 17–18 (2016) (detailing the "Evolution of [the] Corps['s] Civil Works Mission" and noting that the 1986 WRDA "fundamentally transformed the rules for Corps water

provision of the 1986 WRDA that sets forth the cost sharing formula for "inland waterway transportation" projects. This assertion, however, does not render impermissible the Corps' reliance on the catchall provision for projects with purposes other than flood control and inland waterway transportation. *See* 33 U.S.C. § 2213(c).

While section 2212 sets forth the cost share formulas for inland waterway transportation projects, section 2213 announces cost share formulas for flood control projects, nonstructural flood control projects, and projects with other purposes. The Corps could have reasonably concluded that, given section 2212's instruction that the federal government is to bear 100 percent of cost for operations and maintenance of inland waterway transportation projects, the cost-sharing formulas in this section are more appropriate for federal projects designed to *facilitate* "navigation on the inland waterways," 33 U.S.C. § 2212(b), instead of projects designed to close such waterways to navigation. Indeed, requiring the federal government to continue to operate and maintain a project after the Corps relinquished control would be inconsistent with the very purpose of deauthorization. It was clearly reasonable for the Corps to adopt the cost-sharing formulas outlined in the catchall category for projects with other purposes when determining the cost-share for the closure portion of the MR-GO project. Because the Corps' reliance on the cost-sharing provisions in the 1986 WRDA was reasonable, we defer to that judgment under *Chevron*.

## CONCLUSION

For the foregoing reasons we reverse and render judgment for the Corps in part as concerns the cost allocation formula in the MOA with Louisiana that accompanied closure of the MR-GO, but we dismiss for lack of jurisdiction

projects and their funding" in part by "establish[ing] new cost-share formulas, resulting in greater financial and decision-making roles for local stakeholders.").

No. 15-30962

Louisiana's challenge to the proposed, but not final, agency action for cost allocation concerning the MR-GO ecosystem restoration.

**REVERSED AND RENDERED IN PART, DISMISSED IN PART.**